THE LAW OFFICES OF
BENJAMIN PAVONE, PC

**BENJAMIN PAVONE, ESQ.**

STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

THE LAW OFFICES OF

**BURNS, SCHALDENBRAND & RODRIGUEZ**

EDWARD BURNS, ESQ., STATE BAR NO. 201913
FREDERIK SPIESS, ESQ., STATE BAR NO. 221421
1155 SPORTFISHER DRIVE, SUITE 120
OCEANSIDE, CALIFORNIA 92054
TELEPHONE: 760 453 2189
FACSIMILE:  760 453 2194
BURNS EMAIL: ewburns@bsrlawyers.com
SPIESS EMAIL: fspiess@bsrlawyers.com

THE LAW OFFICES OF

**AFFELD GRIVAKES ZUCKER LLP**

GREGG ZUCKER, ESQ., STATE BAR NO. 166692
VICTORIA NIEWRZOL, STATE BAR NO. 282889
2049 CENTURY PARK EAST, SUITE 2460
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310 979 8700
FACSIMILE:  310 979 8701
ZUCKER EMAIL: gz@agzlaw.com
NIEWRZOL EMAIL: vn@agzlaw.com

THE LAW OFFICES OF

**DAVID ELLIOT, ESQ.**

STATE BAR NUMBER 270381
110 WEST A STREET, SUITE 750
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 858 228 7997
FACSIMILE:  619 255 1856
EMAIL: elliot.david@hotmail.com

ATTORNEYS FOR THE PLAINTIFFS
(Additional attorneys for Plaintiffs on signature page)

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| FREDERICK BEAGLE;<br>DON BELARDES;<br>FLOYD BOYD;<br>RICHARD BURKE;<br>JOSEPH BUSTAMONTE;<br>CHARLES CARTER;<br>OTHA CLARK;<br>DONALD DIBBLE;<br>JEROME FELDER;<br>CANDELARIO GARZA;<br>JEREMY HOLLIS;<br>SCOTT IMUTA;<br>INFINITY;<br>GEORGE JOHNSON;<br>BRUCK KOKLICH;<br>GRADY MONTGOMERY; | **CASE NO:**<br><br>**COMPLAINT FOR:**<br><br>I.  **VIOLATION OF 42 U.S.C. § 1983**<br><br>   (8th Amendment Violation - Reckless Exposure to Dangerous Conditions)<br><br>II.  **VIOLATION OF 42 U.S.C. § 1983**<br><br>   (8th Amendment Violation - Deliberate Indifference to Serious Medical Needs)<br><br>III.  **NEGLIGENCE**<br><br>   **DEMAND FOR JURY** |

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

PETER ROMERO;
JOSH THOMAS;
AARON TILLIS;
RENE VILLANUEVA;
BERTRUM WESTBROOK; and
WAYNE WOODS,

PLAINTIFFS,

v.

ARNOLD SCHWARZENEGGER,
FORMER GOVERNER OF THE STATE
OF CALIFORNIA;

EDMUND G. BROWN, GOVERNOR
OF THE STATE OF CALIFORNIA;

JEFFREY A. BEARD, SECRETARY OF
THE CALIFORNIA DEPARTMENT OF
CORRECTIONS AND
REHABILITATION (CDCR);

PAUL D. BRAZELTON, FORMER
WARDEN, PLEASANT VALLEY
STATE PRISON;

MATTHEW CATE, FORMER
SECRETARY OF THE CALIFORNIA
DEPARTMENT OF CORRECTIONS
AND REHABILITATION;

JAMES D. HARTLEY, WARDEN
AVENAL STATE PRISON;

SUSAN L. HUBBARD, FORMER
DIRECTOR, DIVISION OF ADULT
OPERATIONS;

DEBORAH HYSEN, CHIEF DEPUTY
SECRETARY, FACILITIES
PLANNING, CONSTRUCTION &
MANAGEMENT;

DR. FELIX IGBINOSA, MEDICAL
DIRECTOR, PLEASANT VALLEY
STATE PRISON;

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

CHRIS MEYER, SENIOR CHIEF, FACILITIES PLANNING, CONSTRUCTION & MANAGEMENT;

TANYA ROTHCHILD, FORMER CHIEF OF THE CLASSIFICATION SERVICES UNIT;

DWIGHT WINSLOW, M.D., FORMER MEDICAL DIRECTOR, CDCR;

JAMES A. YATES, FORMER WARDEN OF PLEASANT VALLEY STATE PRISON; AND

UNKNOWN DEFENDANTS 1-100,

IN THEIR INDIVIDUAL CAPACITIES;

J. CLARK KELSO, RECEIVER, CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES,

IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES,

　　　　　DEFENDANTS.

# I.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to Title 28 U.S.C. §§ 1331 and 1343.  The individual Defendants are persons who recklessly caused Plaintiffs to contract Valley Fever, a lifelong and crippling disease. Infliction of that disease constituted cruel and unusual punishment in violation of the 8th Amendment, depriving Plaintiffs of a federally-guaranteed right under color of state law in violation of Title 42 U.S.C § 1983 and causing substantial damages to Plaintiffs.  The Court has jurisdiction over Plaintiffs state-law claims under 28 U.S.C. § 1367.

2.      Venue is properly in this Court, pursuant to Title 28 U.S.C § 1391(b)(1), as this judicial district is the residence of one or more of the Defendants, and all of the Defendants are believed to be residents of the State of California. Pursuant to Local Rule 120(d) of the Eastern District, the action is filed in Sacramento County because the majority of the defendants are located in Sacramento, the bulk of the evidence is based on activities of state officials in Sacramento, including the senior officials of CDCR which is headquartered there, and the Plaintiffs themselves prefer for their convenience for venue to be in Sacramento.

3.      Plaintiffs make the following allegations upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of counsel, which included, without limitation: a) review and analysis of public documents published by the State of California, Department of Corrections and Rehabilitation (CDCR) and other public agencies; b) review and analysis of public filings, press releases and other publications by certain of the Defendants and other non-parties; c) review of news articles, medical and other reference sources, and postings on the State of California CDCR and correctional facility websites concerning the issues described herein; and d) review of other publicly available information concerning CDCR, the medical conditions and treatment described herein, and the individual Defendants.

## II.

## INTRODUCTION

4.     The American system of criminal justice requires that state correctional authorities carry out the exact sentence determined by the judicial process – no more and no less.  Instead, Defendants imposed on Plaintiffs a lifelong, crippling, and sometimes fatal disease in addition to their lawfully determined sentences.

5.     The disease, called Coccidioidomycosis or "Valley Fever," is carried by a fungus-like organism that lives and reproduces in the soils in certain limited geographic areas. The organism produces spores that can infect humans if they are breathed in.  It is not contagious between persons but to those who become infected it can be debilitating, disfiguring, and intensely painful.  If the disease is not treated quickly, accurately, and indefinitely, it can be fatal.  Over (30) prisoners have already died from the disease and many more live with serious medical complications from it.

6.     For many of those who contact the spores, the encounter is likely to lead to a relatively mild form of the disease, with mild or moderate flu-like symptoms or no symptoms.  But the disease can rapidly progress to a so-called disseminated form for some, particularly those in certain ethnic and racial groups including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as for anyone who may be immune-compromised or immune-suppressed, such as those taking medication for chronic arthritis.

7.     Disseminated coccidioidomycosis attacks multiple organ systems including the skin, lungs, eyes, bones, joints, nervous system and brain. Victims of the disseminated form require lifelong treatment and may lose limbs to amputation, require sections of bone or whole organs to be removed, may suffer disfiguring skin lesions, and if the disease attacks the brain may suffer permanent brain damage or die from meningitis.

8.     Plaintiffs are inmates and former inmates of the state correctional system who contracted Valley Fever as a result of Defendants' reckless actions. Plaintiffs

were required to serve their lawful sentences. They did not also deserve a life-long debilitating illness as a result of Defendants' deliberate indifference.

9. Defendants knew that placing inmates in prisons where the prevalence of spore-laden soils was a known hazard – where Valley Fever was already occurring at epidemic rates – posed an unacceptable risk of irreparable harm to them. Yet Defendants not only placed Plaintiffs in harm's way, they also failed to implement even rudimentary measures recommended by the correctional authority's own medical experts to protect Plaintiffs from the disease.

10. Defendants could have taken any of several actions to prevent Plaintiffs from contracting the disease. Susceptible prisoners could have been diverted or transferred away from the so-called hyper-endemic prisons, either by adoption of an appropriate policy or on a case-by-case basis through ministerial decisions. Or, as CDCR's own staff experts repeatedly recommended, Defendants could have implemented basic soil control measures at the prisons to reduce exposure: steps such as paving, landscaping, and soil stabilization. Further, prison authorities repeatedly recommended that prison ventilation systems be improved or that the existing ventilation systems be properly maintained to protect inmates against indoor exposure to the spores. Defendants took none of these actions.

11. Instead, Defendants authorized major construction, which churns the soil and throws the spores into the air, immediately adjacent to one of the most dangerously infectious prisons.

12. Defendants failed to take even the above, straightforward protective measures, and continued to transfer high-risk inmates to the hyper-endemic prisons, knowingly exposing them to serious disease risks and demonstrating a reckless indifference to Plaintiffs' safety, health, and constitutional rights.

13. Plaintiffs have sought to resolve this matter through administrative remedies where required, to no avail. They have exhausted all available and necessary administrative remedies. Plaintiffs' administrative complaints were

sufficient to put prison authorities on notice of the nature of wrong for which redress was sought, and Defendants waived the defense of failure to exhaust with respect to California Government Tort Claims Act claims. To the extent any exhaustion requirements have not been expressly or statutorily satisfied, which Plaintiffs assert they have, any such requirements are excused by Defendants' conduct.

## III.

## THE DEFENDANT PARTIES

14. Defendant Arnold Schwarzenegger is the former Governor of California, having acted in that position from 2003 through 2011. The Valley Fever epidemic at the hyper-endemic California prisons began and escalated sharply during that period. Former Governor acknowledged at the time that inmates were being sickened but he chose to take no action to address the epidemic; further, he knowingly condoned subordinates' actions that greatly increased Plaintiffs' exposure to the disease and greatly increased their risk of infection.

15. Defendant Schwarzenegger, as Governor, had the authority to establish the state's executive-branch policies and practices including those at CDCR. At a minimum, a policy of excluding known high-risk inmates from hyper-endemic prisons would have prevented Plaintiffs from being exposed to and subsequently contracting Valley Fever. Schwarzenegger acted with deliberate indifference to grave harm to Plaintiffs in failing to adopt an exclusion policy that would have prevented high-risk inmates from being located at or remaining at the hyper-endemic prisons.

16. Schwarzenegger was also grossly negligent in failing to supervise subordinate officials who, by ministerial action or inaction, also violated Plaintiffs' rights and negligently caused their harm by placing them at hyper-endemic prisons and failing to maintain those facilities in a safe condition.

17. In addition, Defendant Schwarzenegger was grossly negligent himself in condoning the ministerial decision by his subordinates to authorize major construction at or immediately adjacent to the hyper-endemic prison at Pleasant Valley, which

would inevitably increase inmates' exposure to the dangerous spores. Former Governor Schwarzenegger is believed to reside in Los Angeles County, California.

18. Defendant Edmund G. Brown is the current Governor of the State of California, having succeeded Former Governor Schwarzenegger in January 2011. Governor Brown had the authority and the means to discontinue state correctional authority policies and practices created and implemented under his predecessor, including policies that allowed the Plaintiffs' transfer to and continued housing at unconstitutionally dangerous prisons where Valley Fever was epidemic.

19. Defendant Brown knew that the policy of housing high-risk prisoners at hyper-endemic prisons was a violation of their constitutional right to be free from cruel and unusual punishment, but knowingly and recklessly allowed that policy to continue and failed to take any action to remedy those wrongs. Brown acted with deliberate indifference to the harms inflicted on Plaintiffs and, like Defendant Schwarzenegger, was negligent in supervising subordinates that proximately caused Plaintiffs to be infected with Valley Fever. Governor Brown resides in Sacramento, California.

20. Defendant Jeffrey A. Beard is the current Secretary of the California Department of Corrections and Rehabilitation (CDCR). Beard was appointed to that position in December, 2012. CDCR is the agency that administers all of California's prisons and is responsible for all its prisoners. CDCR has approximately 170,000 prisoners under its authority and has a budget of $9 billion, making it the State's largest agency. As Secretary, Beard is responsible for the policies and practices of the organization as well as for day-to-day operational decisions. Beard allowed the policies created by his predecessor, which deprived Plaintiffs of their constitutional right to be free of cruel and unusual punishment, to continue. Beard was aware that the hyper-endemic prisons posed an unacceptable risk of infection by Valley Fever, and was grossly negligent in allowing unsafe conditions at the prisons to remain uncorrected and high-risk inmates to be transferred there, and in failing to adequately supervise subordinates who had organizational responsibility for these mandatory

duties, further causing harm to Plaintiffs under his tenure by these routine ministerial acts. Beard is believed to reside in Sacramento, California, County of Sacramento.

21. Defendant Matthew Cate was the Secretary of the CDCR from 2008-2012. Defendant Cate created and continued the policies that allowed the transfer of inmates to dangerous prisons and that failed to acknowledge or protect high-risk prisoner groups. Knowing that inmates were being exposed to epidemic risks of infection, Cate was grossly negligent in allowing unsafe conditions at the prisons to remain uncorrected and high-risk inmates to be transferred there, and in failing to supervise the Classification, Facilities, and prison-level officials who continued to expose high-risk inmates to infection and who failed to take routine ministerial actions to reduce the risk at those prisons. Cate was responsible both for the organizational policies and for his subordinates' subsequent ministerial acts that contributed to Plaintiffs' harm. Mr. Cate is believed to reside in Sacramento County.

22. Defendant Dr. Susan L. Hubbard is the former director of CDCR's Division of Adult Operations and was personally involved in the decision to adopt a policy, reflected in her memorandum dated November 20, 2007, that continued to allow Plaintiffs and others who were members of high-risk groups to be housed at hyper-endemic prisons. That policy acknowledged the health risk to selected medically-compromised inmate groups but deliberately and willfully omitted the fact, well-known to CDCR officials including Dr. Hubbard, that African-Americans, Hispanics, Filipinos and other Asians at a minimum were also at unacceptably high risk of infection. Hubbard acted with deliberate indifference to the risks of harm that were inflicted on Plaintiffs. Hubbard is believed to reside in Carmichael, California, Sacramento County.

23. Defendant Tanya Rothchild is the former Chief of CDCR's Classification Services Unit (CSU). The CSU is responsible both for setting policies that assign or prevent the assignment of certain types of inmates to certain prisons, and for making the ministerial decisions that assign each individual inmate to a

specified prison. Rothchild created and continued policies that authorized the transfer of at-risk inmates to the hyper-endemic prisons, without regard to those inmates' innate susceptibility to infection. Rothchild further was grossly negligent in supervising subordinates who were responsible for individual classification and transfer decisions. Rothchild is believed to reside in Elk Grove, California, Sacramento County.

24. Defendant Deborah Hysen is the Chief Deputy Secretary, CDCR Executive Office of Facility Planning, Construction and Management. Defendant Hysen, after identifying several environmental mitigation measures that could have reduced the risk of infection to Plaintiffs, failed to implement any of those measures at the hyper-endemic prisons. Hysen was grossly negligent in failing to carry out this mandatory and ministerial duty. Ms. Hysen is believed to reside in Granite Bay, California, Placer County.

25. Defendant Chris Meyer is the Senior Chief, CDCR Executive Office of Facility Planning, Construction and Management. Meyer was appointed to that position in 2009. Meyer was aware that environmental mitigation measures could have reduced the risk of infection to Plaintiffs but failed to implement any such measures at the hyper-endemic prisons and was grossly negligent in his supervision of subordinates who also had organizational responsibility for this ministerial task. Meyer is believed to reside in Sacramento County.

26. Defendant J. Clark Kelso is currently serving as the Receiver of the California Correctional Health Care Services agency (CCHCS).[1] As Receiver, Kelso is responsible for directing the agency and establishing its operational policies. At all relevant times, Kelso was responsible for CCHCS' continuing failure to adequately

---

[1] CCHCS is the California state agency that has been responsible for health care in the state prison system since October 3, 2005, after the *Plata* court determined that the then-existing prison health care system violated the Eighth Amendment. *Plata v. Brown*, Case No. 01-1351 [Northern District of California]. The *Plata* court ordered CCHCS to take over prison healthcare; it has since been legally responsible for overseeing 7,000 staff addressing health care in California state prisons.

address the Valley Fever epidemic in the prison health system.  On information and belief, CCHCS could have established policies to prevent prisoners at increased risk of contracting Valley Fever from being assigned to hyper-endemic prisons or to identify such prisoners already located there and transfer them away once identified. Defendant Kelso was fully apprised of the risk to Plaintiffs[2] but failed to establish policies to protect them and was grossly negligent in supervising subordinates who shared this responsibility.  As Receiver, Mr. Kelso is named in his official and his individual capacities. Mr. Kelso is believed to reside in Elk Grove, California, Sacramento County.

27.     Defendant Dwight Winslow, M.D. is the former Statewide Medical Director for CDCR.  Winslow authored a memo in June, 2007 disclosing that the CDCR was aware of the greatly increased risk of infection by Valley Fever at the hyper-endemic prisons, and that that risk was multiplied several times over for certain ethnic groups.  Winslow made recommendations at that time to take action to reduce infection rates inside the prison to approximately those experienced in the local civilian population.  Just five months later, however, in a memorandum dated November 2007, Winslow's policy recommendations with respect to the Valley Fever epidemic deliberately ignored and excluded from protection all of the African-American, Hispanic, Filipino and other Asian inmates that were at greatly increased risk.

28.     Winslow personally participated in CDCR's adoption of policies that allowed the vast majority of high-risk – as well as all other inmates – to continue to be transferred to and housed at prisons that were experiencing epidemic levels of Valley Fever, without taking any remedial measures at those prisons to prevent infection. Winslow was also grossly negligent in supervising subordinates with operational

[2] *See, e.g.,* information sources such as, "*Coccidioidomycosis in California's Adult Prisons 2006-2010,*" CCHCS Public Health and Quality Management Units, April 16, 2012.

responsibility for protecting inmates at risk of contracting the disease. Dr. Winslow is believed to reside in Smith River, California, Del Norte County.

29.    Defendant Paul D. Brazelton was Warden of Pleasant Valley State Prison (PVSP) from the summer of 2012 to the Fall of 2013.  Brazelton knew of the epidemic rates of infection at his prison, and of his mandatory, non-delegable duty to provide a safe facility and reasonable safeguards for inmate health, but recklessly failed to take any action to correct the unsafe conditions at the prison, to prevent Plaintiffs from being housed there, or to protect inmates including Plaintiffs from contracting Valley Fever.  Mr. Brazelton is believed to reside in Coalinga, California, County of Fresno.

30.    Defendant James A. Yates is the former warden of Pleasant Valley State Prison and appears to have occupied that position from at least 2005 until 2012. Yates was aware of the epidemic of Valley Fever occurring at his prison, yet failed to adopt any policies or practices to avoid the further transfer of inmates to the prison or to protect inmates located there that he knew to be at elevated risk of contracting the disease. Yates was responsible for the absence of facility-level policies that would have prevented Plaintiffs from being located at PVSP and contracting Valley Fever, was grossly negligent in failing to supervise subordinate staff responsible for accepting at-risk inmates to the facility and failing to transfer identified at-risk inmates away. He was also grossly negligent in failing to take the required ministerial actions necessary to make PVSP safe for inmates as described herein. Yates is believed to reside in Corcoran, California, Kings County.

31.    Defendant James D. Hartley is the current warden of Avenal State Prison.  Hartley made an independent decision to accept certain Plaintiffs at the hyper-endemic prison.  Further, Mr. Hartley was and is responsible for operations at Avenal and continued the existing policy to accept at-risk prisoners during a period of epidemic infection rates and, on information and belief, also failed to implement

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

basic remedial measures recommended to make the facility safe as described herein. Hartley is believed to reside in the Avenal area, Kings County.

32.    Defendant Dr. Felix Igbinosa is and at all times relevant was the medical director of Pleasant Valley State Prison.   As the responsible medical official at PVSP he was fully aware of the epidemic incidence rates of the disease and the medical risks to Plaintiffs at that location, yet failed to take any actions to address the epidemic or to reduce inmate exposure to the disease.  Igbinosa was therefore also implicated in PVSP's failure to establish a prison-level policy of screening inmates and potential inmates for risk factors for Valley Fever; such screening would have enabled Plaintiffs to be transferred away from the hyper-endemic prison and allowed them to avoid contracting the disease. Dr. Igbinosa appears to reside in Clovis, California, in Fresno County.The true names and capacities, whether individual, corporate, associate, governmental or otherwise of some of the Defendants herein are presently unknown to Plaintiffs.  Plaintiffs will seek leave of the Court to amend this Complaint to show the true names and capacities of such Defendants if and when these are ascertained by Plaintiffs.

33.    Plaintiffs are informed and believe, and therein on information and belief allege, that each and every act or event was done, caused, suffered, allowed, or committed by Defendants, or by any of them, or was done, caused, suffered, allowed, and permitted by each and every Defendant, within the scope and course of his or her duties as the agent, principal, or partner, of each and every other Defendant.

34.    Some Unknown Defendants are one or more officials of the Classification Services Unit, a division of the California Department of Corrections and Rehabilitations, which developed policies and practices that allowed the transfer of particular Plaintiffs to hyper-endemic prisons.

35.    Additional Unknown Defendants are one or more officials of the Classification Services Unit, a division of the California Department of Corrections

and Rehabilitations, who authorized or supervised the ministerial decisions to transfer particular Plaintiffs to particular hyper-endemic prisons.

36.    Additional Unknown Defendants are one or more of the officials and staff representatives of the Classification Services Unit, a division of the California Department of Corrections and Rehabilitations, who made the decisions to transfer particular Plaintiffs to particular hyper-endemic prisons.

37.    Unknown Defendants, who were involved in the policies that led to Plaintiffs' injuries or were directly involved in deciding to transfer or keep Plaintiffs' at hyper-endemic prisons, are named herein as Unknown Defendants will be individually identified as their identities become known.

38.    Each Defendant other than Defendant Kelso is named in his or her individual capacity. Defendant Kelso, as Receiver, is named in his official and individual capacities.

## IV.  FACTUAL ALLEGATIONS
### IV(a)
### The Threat of Coccidioidomycosis

39.    Coccidioidomycosis has long been known as a dangerous parasitic disease caused by the inhalation of airborne fungal spores of the Coccidioides immitis organism found in soil in certain locations in California and the Southwest.[3]

40.    When a human inhales the Coccidioides fungal spores, those spores may lodge in various locations in the respiratory system. The spores then grow and transform into large tissue-invasive parasitic spherules.  These spherules enlarge and rupture, each releasing as many as thousands of new "endospores" that can invade surrounding tissue or can migrate through the blood to other tissues and organs, where they repeat the process and continue to multiply in the body.

---

[3] Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews (September, 1961), 25(3), pp. 310-320, at p. 311.

41. The developing endospores grow on host body tissue, dissolving some of that tissue in the process. Depending on the site of the disseminated infection, this may lead to disfiguring skin lesions, destruction of soft tissue, erosion of bones, joints, and eyes, ulcers penetrating into the pleura in the lungs, and the colonization of other organs including the brain. Lesions may occur in every organ in the body. [4]

42. Coccidioides replicates so quickly that it is considered the most virulent fungal parasite known to man.[5] The Coccidioides fungus was at one time listed as a "Select Agent" – a potential weapon of biological warfare or bioterrorism – in the Antiterrorism and Effective Death Penalty Act of 1996 and the Public Health and Security and Bioterrorism Preparedness and Response Act of 2002, though it was subsequently delisted as treatments became available for it. [6] The Centers for Disease Control (CDC) requires scientists handling Coccidioides spores to use protective protocols just one level below that used for handling the hemorrhagic fever Ebola virus.[7]

43. Coccidioides is not transmitted between humans or animals, and not everyone who breathes in the Coccidioides fungal spores becomes seriously ill. Sources suggest that some 60% of people who are exposed to the Coccidioides fungus do not show overt symptoms of illness; their disease-fighting systems

[4] Smith, Pappagianis, *supra*.

[5] Dixon, *Coccidioides Immitis as a Select Agent of Bioterrorism*, Journal of Applied Microbiology (October 2001), 91(4):602-5.

[6] Filip & Filip, Valley Fever Epidemic, Golden Phoenix Books (2008), p. 2 (hereinafter "Filip"). Published in 2008, this reference summarized 268 published medical studies, professional journal articles, and other authoritative material concerning Coccidioidomycosis.

[7] "*Biosafety in Microbiological and Biomedical Laboratories*," U.S. Department of Health and Human Services Public Health Service Centers for Disease Control and Prevention National Institutes of Health, (2009, 5th Edition).

overcome the exposure without medical treatment and they are thereafter apparently immune to the dangers of contracting Valley Fever.

44. In the general population, most of the remaining 40% will show symptoms of a respiratory illness resembling the flu that may last weeks or months.[8]

45. In a percentage of those exposed, however, which varies greatly depending on the ethnicity and medical status of the group, the infections will cause severe, life-threatening pneumonia or blood-borne spread of the fungus from the lungs to other parts of the body, which is referred to as the disseminated infection.[9]

46. Disseminated infection most commonly involves skin and soft tissues, bones, and the central nervous system. Both the spore-provoked pneumonia and the disseminated infection, especially meningitis, can be fatal.[10]

47. Per Filip: "Valley Fever can kill, but it can also affect its survivors for a lifetime. It can disseminate to the eyes where it can cause blindness and possibly require the removal of an infected eye. Valley Fever can attack any organ or limb in the body to cause lesions, chronic pain, and to require amputations. Some cases can necessitate surgical removal of an infected lung…." Valley Fever can cause facial lesions that leave permanent scarring and disfigurement. In the most lethal varieties of the disease it can attack the lining of the brain (meninges), [leading to] permanent brain damage. Valley Fever can infect the bones and joints, causing chronic debilitation, pain, and resulting in the need for joint fusions or amputations ... people with Valley Fever have become wheelchair bound as a result of disseminated spinal lesions ...."[11]

---

[8] Dec. John Galgiani, ¶ 7 (April 25, 2013, Docket 2598 in *Plata* Eastern District case), Valley Fever expert.

[9] *Ibid*.

[10] *Galgiani, supra, ¶ 7*.

[11] Filip & Filip, Valley Fever Epidemic, Golden Phoenix Books (2008), p. 2 (hereinafter "Filip") at pp. 63-65.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

48. Once the disease is established in the disseminated form, there is no cure. The disease is treated with antifungal drugs which can have severe side effects and must be taken for a lifetime. These drugs do not cure the disease, however, since they only reduce but do not eliminate the population of infectious spores. Continuous treatment with oral anti-fungal medication may keep the disease temporarily at bay, but the disease remains within an infected person for his or her lifetime and repeated debilitating relapses may be expected. As many as 75% of patients who stop taking the drugs will relapse within a year, with dire consequences.[12]

49. Treatment of Valley Fever is expensive, for the patients and for the public health system. "The cost of antifungal medication is high, in the range of $5,000 to $20,000 per year of treatment. For managing critically ill patients with coccidioidomycosis, there are considerable additional costs including intensive care support for many days or weeks."[13] Some patients require repeated hospitalization for the disseminated disease. The cost for such treatment is estimated to be in the range of $25,000 - $35,000 per episode.

50. Plaintiffs in this case, who have had Valley Fever for relatively short amounts of time, have already reported one or more of the following symptoms: skin lesions; fever; shortness of breath and/or wheezing; chronic and severe coughing including coughing up blood; chest pain; uncontrollable chills and night sweats; nausea; rapid weight loss; rashes; burning sensations in various body parts (feet, joints, etc.); chronic exhaustion; joint pain, stiffness and swelling; swelling of the legs, ankles, and feet; sensitivity to light; vision problems; neurologic symptoms

---

[12] *See, e.g.,* Filip, p. 40; Kanan, Renee, M.D., "*Valley Fever,*" Dept of Corrections Memo to Health Care Managers November 5, 2004 [hereinafter "Kanan" or "Kanan Memo"], p. 4; Galgiani, John, et al., *Practice Guidelines for the Treatment of Coccidioidomycosis*, Oxford Journals (2000).

[13] Galgiani, *Practice Guidelines*, at p. 659.

including inability to concentrate; foot drop and partial paralysis; and excruciating head and neck pain consistent with meningitis.

51.     Over thirty inmates have died from exposure to the disease within the prison system from 2005 to the present; many more will likely die prematurely.

### IV(b)
### Defendants Deliberately Ignored the Risk to Plaintiffs

52.     Officials have known about the prevalence of Valley Fever in the locations of the hyper-endemic prisons, and the disease's acute risks to the health of those exposed, for over 50 years.[14]

53.     By the late 1960's, employers were being warned that  "the importation of any susceptible labor force into the endemic areas carries with it the responsibility for reducing the rate and severity of infection through whatever dust control measures are possible and for providing a vigorous program of medical surveillance."[15]

54.     Despite this notice to state officials, between 1987 and 1997, the CDCR built eight prisons within the endemic and hyper-endemic regions of San Joaquin Valley:   Avenal State Prison; California Correctional Institution; California State Prison-Corcoran; Wasco State Prison; North Kern State Prison; Pleasant Valley State Prison; California Substance Abuse Treatment Facility and State Prison at Corcoran; and Kern Valley State Prison.

55.     Though all of these prisons presented an elevated, unacceptable risk of exposing inmates to Valley Fever, one in particular, Pleasant Valley State Prison, was extraordinarily dangerous.

---

[14] *See*, *e.g.*, Smith, C. E.: *The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever")*, American Journal of Public Health 30, at p. 600 (June 1940).

[15] Schmelzer and Tabershaw, *Exposure Factors In Occupational Coccidioidomycosis,* American Journal of Public Health and the Nations Health, January 1968: Vol. 58, No. 1, p. 111.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

56. Pleasant Valley State Prison (PVSP) is located in Coalinga, California. The prison provides long-term housing and services for minimum, medium and maximum custody inmates. It was opened in November 1994, covers 640 acres and was designed to house 3,000 inmates. Today, there are approximately 730 staff and 5,188 prisoner beds.

57. The soil surrounding and under PVSP is densely contaminated with the Coccidioides fungus. Yet, Defendants failed to take even the most basic precautions to guard against exposure.

58. There are broad expanses of bare dirt, without any vegetation at all, on the prison grounds, which allows the free circulation and spread of the cocci spores from the prison yard soils into the air and into the buildings' ventilation systems.

59. In November 2004, before the drastic rise in incidence rates at PVSP, Renee Kanan, M.D., Deputy Director of Health Care Services at CDCR, wrote a memorandum to all health care managers, staff members, and other officials within CDCR regarding Valley Fever and its origin in soil fungus.

60. The Kanan Memo included a three-page overview of Valley Fever, its cause, diagnosis, symptoms and treatment. The memorandum admitted that: (a) the Central Valley prisons are located within areas which host the dangerous cocci fungus in the soil (b) Valley Fever has "potential lethality" for people exposed to the fungus; (i) "winds and construction activity may cause the organism to be blown into the air where it can be inhaled and pneumonia can occur"; (ii) "[a] percentage of individuals exposed to coccidioides immitis … will progress to frank, generally patchy pneumonia (the incubation period is up to four (4) weeks), or to disseminated disease"; (iii) "[t]he risk and incidence of disseminated disease are highest in American Indians, Asians, Blacks and immuno-compromised individuals"; (iv) "[d]issemination usually occurs to the skin, bones and meninges, although any part of the body can be involved"; (v) bone lesions, back pain and paraplegia may result from Valley Fever; (vi) skin lesions "imply a poor prognosis and often herald

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

widespread dissemination"; (vii) "[m]eningeal involvement eventually leads to a severe, unremitting headache" and (vii) "[t]reatment must be continued for life to maintain control of symptoms; there is no cure for coocidioidal meningitis at this time."

61.     Dr. Kanan's memo was and continues to be widely available to state officials after it was distributed within CDCR.[16]

62.     Starting in 2005, shortly after the Kanan memo was distributed and approximately 5 years before the earliest claim of injury made by a plaintiff in this lawsuit, Pleasant Valley State Prison (PVSP) began to experience an epidemic of Valley Fever, including multiple deaths from the disease.

63.     Infection rates at PVSP during this time were as much as 1,000 times the rate seen in the local population, yet state officials continued to transfer susceptible and non-susceptible inmates alike to this prison.

64.     An internal CDCR memorandum dated October 27, 2006 to all administrative personnel, apparently generated at the request of state government officials, described the epidemic infection rates:

"The Cocci information requested by [California government officials in] Sacramento is as follows:

2001 – 42 inmates
2002 – 38 inmates
2003 – 80 inmates
2004 – 66 inmates          1 death
2005 – 187 inmates         5 deaths

[16] The Kanan Memo was circulated at a minimum to Nadim Khoury, M.D. (Assistant Deputy Director (A), Clinical Policy and Programs Branch, Health Care Services Division of Department of Corrections); Donald Smilovitz, M.D. (Physician and Surgeon, Infection Control Department, CMC); Anita Mitchell, M.D. (Chief Medical Officer, Clinical Standards & Services (CSS), HCSD); and Tim Rougeux (Project Director, Medical Programs Implementation) and directed these individuals to ". . . ensure that the attachment to this memorandum is distributed to your staff and is available for their reference in the clinical treatment areas of your facility."

2006 – 1145 inmates        8 deaths

The above information is an approximation of the number of inmates with positive Cocci lab results."[17]

65.    This memo showed that Valley Fever incidence rates increased at PVSP by more than 445% between 2001 and 2005, and by over 2,500% by 2006.

66.    In 2006 (through mid-August), the California prison system accounted for 30% of all Valley Fever cases reported to the State Department of Health Services.

67.    A retrospective study published in April of 2012 found that the infection rate at PVSP in subsequent years was approximately 7,011 cases for every 100,000 inmates.  During this time, seven out of every hundred inmates at PVSP became infected with Valley Fever.

68.    After the 2005 outbreak at PVSP, California Correctional Health Care Services (CCHCS) requested and received assistance from the California Department of Public Health (CDPH) in assessing and controlling cocci at PVSP.  CDPH confirmed that at least 29 persons had to be hospitalized and there had already been at least four deaths.

69.    CDPH reported that the rate of cases at PVSP was 38 times the rate in residents of Coalinga, and 600 times the rate in Fresno County.  CDPH reported associations of disease with increased outdoor time, pre-existing health conditions, and African-American race.  CDPH concluded their report with specific recommendations for reducing the incidence of coccidioidomycosis in CDCR prisons.

70.    An August 3, 2006 internal memorandum further confirmed that Defendants knew they were housing inmates in hyper-endemic locations.[18]

---

[17] Durst, Karen, "Coccidioidomycosis (Cocci) Report," (CRCR memorandum dated October 27, 2006 to Administrative Personnel).

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

71.     During 2006-2010, rates of Valley Fever in the hyper-endemic area prisons worsened.  The rates at Pleasant Valley State Prison, Avenal State Prison, Wasco State Prison, and North Kern State Prison, were each significantly higher than rates in the counties in which they are located.  In comparison with the overall rate in California (7/100,000), the rate at PVSP was 1,001 times higher (7011/100,000), the rate at ASP was 189 times higher (1326/100,000) and the rate at WSP was 114 times higher (800/100,000).

72.     The rates at PVSP, ASP, and WSP were also far greater than the infection rate in Kern County, the county with the highest reported rate of cocci in California (135/100,000).

73.     Of 27 state inmates who died of Valley Fever between 2006 and 2010, at least 18 of them (or 68 percent) were African-Americans, according to the report. The rate of death due to Valley Fever among African-Americans was twice that among non-black inmates.

74.     Experts, including CDCR staff, attributed the rapid and continued increase in Valley Fever cases at PVSP in 2005/2006 to the new construction initiated next to the prison.

75.     Defendants and other government officials multiplied the risk to inmates at PVSP when they decided to construct a new mental hospital facility, Coalinga State Hospital (CSH), immediately adjacent to the prison, less than 200 yards away.

76.     Dr. Pappagianis' report describes "the influence of 'new construction' (including excavation)" on PVSP's Valley Fever rates as follows: "Construction began in late Summer to early Fall [2005] and soon the number of cases increased. … It was evident that PVSP had a higher rate of infections than other institutions some of which had comparable numbers of inmates.  By mid-August 2006, PVSP had 300 new cases recognized, far exceeding those recognized (51) [at] Avenal, the next

---

[18] *See* CDCR Memo, dated August 3, 2006, from Dovey & Farber-Szekrenyi, "*Inmate Patients at High Risk of Valley Fever Excluded from Specific Central Valley Institutions*," p. 1 (hereinafter "Dovey").

highest represented. We calculated incidence of 3,000/100,000 for PVSP in 2005; and in 2006 up to mid-August the rate was 6,000/100,000. For comparison, the highest incidence rate of [Valley Fever] was 572/100,000 for Kern County during the epidemic year 1993.

77. The excavation and construction adjacent to the prison churned an inordinate amount of the endemic *Coccidioides* fungal spores into the ambient air in and around the prison.[19]

78. Defendants recklessly exposed the inmate population and failed to take any adequate precautions to protect inmates from the spores that would inevitably migrate onto the PVSP grounds and facility as a direct result of the soil disruption caused by the construction.

79. After the CDHP report, CCHCS issued a number of recommendations in June, 2007 which included: (i) proceeding with environmental mitigation in the prisons through landscaping with ground cover, and placing concrete and other dust reducing materials on the grounds; (ii) *continue the diversion and relocation of inmates at high risk for coccidioidomycosis*; (iii) reinstate the public health system in prisons; (iv) notify the local health departments of new cases identified by prison providers; (v) expand epidemiologic research regarding cocci; (vi) support vaccine research; and (vii) do not expand prison beds in the hyper-endemic areas, especially at Pleasant Valley State Prison. (*Emphasis added.*)

80. In November, 2007, prison health officials issued a formal exclusion policy for selected inmates, persons with certain medical conditions, but failed to exclude the high-risk inmates who belonged to the already well-known ethnic and racial high-risk groups, even though the risks to these groups were known to them

---

[19] *See* Winslow D, Khoury N, Snyder N, Bick J, Hawthorne K, Chapnick R, et al., 2007; "*Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California*," p. 4, June, 2007 [hereinafter "Winslow Recommendations"].

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

from earlier memos. At a time when infection rates at PVSP were nearly 1,000 times those in the unincarcerated population, the 2007 policy knowingly protected only a small fraction of those at risk.[20]

81. From 2007 through 2010, the rate inside PVSP was 6 times higher than the rate among residents of the state mental health facility right next door.[21]

82. In 2009, CDCR first requested and then, without explanation, terminated a project by federal health agencies to assist the California prison system with the Valley Fever epidemic. In December 2009, after CDCR officials had inexplicably canceled the project, two officials at the Centers for Disease Control (CDC) and National Institute for Occupational Safety and Health (NIOSH), wrote to Nikki Baumrind, Ph.D, M.P.H., Chief of CDCR's Occupational and Public Health Section. This letter made it clear that the CDC's and NIOSH's work on the issue had ceased due to the CDCR's "lack of support" for the federal agencies' investigation. The CDC and NIOSH officials reminded the CDCR that *"[p]eople at greater risk for developing disseminated infection include people of African American; Asian or Filipino descent; ... and immunocompromised persons."*[22]

83. On information and belief, based on publically-available sources, then-Governor Schwarzenegger announced in an October, 2011 press conference that the State's policy and practice of transferring prisoners to serve their sentences in Pleasant Valley State Prison would continue unabated, despite the risks of Valley Fever.

---

[20] Hubbard & Winslow, "*Exclusion of Inmate-Patients Susceptible to Coccidioidomycosts from Highest Risk (Hyperendemic) Area Institutions,"* [CDCR Memo, dated November 20, 2007, hereinafter "Hubbard"].

[21] "*Coccidioidomycosis in California Department of Corrections and Rehabilitation Institutions,"* p. 2 [CDCR Report, October 10, 2012].

[22] Letter from NIOSH to CDCR, December 4, 2009, p. 2.

**IV(c)**

**Defendants Knew Certain Groups Were Particularly Susceptible**

84.    Valley Fever has the capacity to infect any person, regardless of race, health status or immunological strength.  But it is currently undisputed and well-known that certain groups are much more likely than others to contract the potentially lethal disseminated form of Valley Fever.

85.    The scientific literature acknowledged the exceptional susceptibility of African-Americans and Filipinos over 80 years ago.[23]

86.    An article in the journal *Military Medicine* in June 2003 observed that "Filipinos and African-Americans have been shown to have up to a 200-fold increased risk of disseminated disease and an increased mortality rate."[24]

87.    California's Department of Health Services referenced the exceptionally high-risk status of these groups in a letter dated March 16, 2006 from Duc Vugia, M.D., M.P.H. of the California Department of Health Services to Bernard Henderson, an inmate at PVSP, citing an article in a contemporaneous medical journal.[25]

88.    In addition to the high-risk ethnic groups, anyone with a compromised or suppressed immune system has an increased risk of developing disseminated Valley Fever.[26]  A compromised immune system may be caused by any of several chronic

[23] *See* Smith, Pappagianis, et al, <u>Human Coccidioidomycosis</u>, Bacteriology Reviews (September, 1961), 25(3), pp. 314, 318, fns. 5, 27.

[24] <u>Filip</u>, p. 29, citing Crum NF, Lederman ER, Hale BR, Lim ML, Wallace MR. "*A Cluster of Disseminated Coccidioidomycosis Cases at a US Military Hospital*,  Mil Med. (June 2003), 168(6), pp. 460-464.

[25] *See* Letter from Duc Vugia, M.D., citing Galgiani article (March 16, 2006)]; Galgiani, John et al., *Coccidioidomycosis*, 41 Clinical Infectious Diseases Journal 1217-1218 ["several-fold higher for persons of African or Filipino ancestry (possibly also for persons of Asian, Hispanic, or Native American ancestry), and as high as 30%-50% of infections for heavily immunosuppressed patients"].

[26] *See, e.g.,* American Thoracic Society, "*Patient Information Series*," American Journal of Respiratory Care Medicine, Vol. 184, p. 6.

diseases including diabetes, HIV, lung disease, organ transplant, or taking TNF inhibitors as medication for arthritis. Individuals over the age of (55) have also been found to be at increased risk, if exposed, of developing the severe disseminated disease.[27]

89. In analyzing reports from the Receiver's medical staff, Dr. Galgiani has noted that "African-American prisoners [in the Central Valley state prisons] died with Valley Fever at a higher rate than the general inmate population, and at much higher rates than African-American men in California."[28] In fact, African-American prisoners comprised 71% of the 34 Valley Fever deaths in CDCR prisons between 2006 and 2011.[29]

90. A 2012 study in the journal Emerging Infectious Diseases found the rate of hospitalization from disseminated cocci among blacks in California was 8.8 times higher than for whites.

91. California's Department of Public Health informed the CDCR in its January 11, 2007, "Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California" that "[p]revious studies have suggested that the risk for extrapulmonary complications is increased for persons of African or Filipino descent, [and] the risk is even higher for heavily immunosuppressed patients." The DPH in 2007 concluded that exclusion of these high-risk inmates was "the most effective method to decrease risk [of Valley Fever infections]."[30]

---

[27] Clinical Infectious Diseases Journal (March 2001) 1:32(5), 708-15. The 2011 Thoracic Society also supports this conclusion, p. 5.

[28] Galgiani Declaration, April 25, 2013 [Docket 2598], ¶ 10.

[29] *Id*.

[30] CCHCS Report dated April 16, 2012 describing recommendations from Jan, 2007, p. 8, Box 2.

92.  Defendants, however, persisted in disregarding all of these findings and specific recommendations.  When, finally, after court order, Defendants issued a policy in 2006 to exclude what they described as high-risk prisoners from the endemic-area prisons, that policy identified only immune-compromised prisoners as being at elevated risk.  Defendants knowingly disregarded all of the findings, prior and subsequent to the issuance of the 2006 policy, that identified the many other high-risk groups including  African-American, Filipino and other Asian, Hispanic, and American Indian, as well as persons over 55 years of age, and the specific recommendations to exclude those groups from the hyper-endemic prisons in order to protect inmates from unacceptable  risk.[31]

## IV(d)

### Each Defendant Had Specific, Actual Knowledge of the Risks to Plaintiffs

93.  Each of the named Defendants was aware that housing these Plaintiffs at a hyper-endemic prison posed a greatly elevated risk of contracting Valley Fever.

94.  In 2006 and 2007, a Fresno County Grand Jury undertook the task of evaluating inmate health status at PVSP and made a series of recommendations.

95.  Beginning in 2007, that Grand Jury issued regular periodic public reports concerning Valley Fever incidence at PVSP.

96.  The Grand Jury observed that "[l]ocal prison officials are well aware of this health crisis..." and stated that inmates, and staff, continue to be at great risk from Valley Fever.

97.  The Grand Jury issued these reports directly to Defendants Beard, Brazelton, Yates, Cate, and Kelso, and they were forwarded to other CDCR officials.

98.  The Grand Jury required Defendants Yates, Cate, Beard and Brazelton at a minimum to respond directly to the Grand Jury regarding these findings, under the authority of California Penal Code Section 919(b).  Defendant Yates also sent copies of his response at a minimum to Defendants Cate, Kelso, and other CDCR officials.

---

[31] Dovey and Hubbard memos, *supra*.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

99. The Grand Jury found, consistent with common medical knowledge regarding the disease, that disease rates for all groups at the prison had increased dramatically since 2004 and that African Americans, Hispanics, Filipinos, and other Asians were at far greater risk from the disease than other ethnicities.

100. In addition to the other sources of information available to them, some of which are discussed further below, Defendants Yates, Cate, Beard, Brazelton, and Kelso were directly and personally informed by the Fresno Grand Jury findings that inmates like Plaintiffs were at drastically increased risk of contracting Valley Fever and susceptible to potentially fatal health consequences as a result if Plaintiffs were housed at or remained at PVSP.

101. In 2005, the prisoners' rights group Prison Movement sent an informational briefing packet directly to then-Governor Schwarzenegger describing the threat posed by Valley Fever, and especially its threat to susceptible groups including African-Americans, Filipinos, elderly inmates and the immune-compromised.

102. Despite his personal knowledge of this threat, in September 2007 then-Governor Schwarzenegger proposed that California construct new dormitories at PVSP to expand by 600 the number of beds and prisoners located there.

103. At a press conference called to announce the expansion plans, Governor Schwarzenegger responded to questions about the fact that the proposed expansion would inevitably expose more prisoners to Valley Fever. Defendant Schwarzenegger indicated he was not concerned about exposing even larger numbers of prisoners to Valley Fever at that time, reportedly stating: "We will go ahead and build."

104. Schwarzenegger was fully informed that inmates housed at PVSP, and the other hyper-endemic prisons, were at a greatly increased risk of contracting Valley Fever.

105. Further, CDCR publishes and distributes an Orientation Manual for all medical personnel. The CDCR Correctional Healthcare Services Orientation Manual

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

discusses the Coccidioiditis epidemic in detail and specifically notes that African Americans, Filipinos, and those with compromised immune systems or chronic diseases are at greatly increased risk for contracting Valley Fever in its most deadly form.[32]

106. The orientation manual is authorized and promulgated by Dwight Winslow, M.D., the Chief Physician Executive at CDCR.

107. CDCR medical personnel and management were aware of the findings in the Orientation Manual and its implications for inmates housed at hyper-endemic prisons.

108. In 2006 the California Department of Public Health, Center for Infectious Disease conducted an epidemiological study of Valley Fever in California prisons (the "Study"). The Study was published in January 2007.

109. The Study found that the number of cases of Valley Fever reported at PVSP in 2005 was 3 times that of the entire rest of Fresno County combined. The Study reported that any persons with suppressed immune systems as a result of disease or medications which are immune-suppressive, such as those for chronic arthritis, are at extremely high risk of the deadliest form of Valley Fever, as are African-Americans, Hispanics, Filipinos and other Asians.

110. The Study recommended that CDCR consider relocating the highest risk groups to areas that are not hyper-endemic for Coccidioides and, at a minimum, to take steps at the prisons to minimize exposure, including ventilation, respiratory protection, and dust suppression and soil control. The CDPH Study was widely circulated within CDCR.

111. Defendants were aware of the CDPH Study and familiar with its conclusions regarding inmates, Valley Fever, and required mitigation measures.

_____

[32] Imai & Winslow, M.D.'s, Department of Correctional Healthcare Services, "*Letter from the Chief Physician Executive*, January 23, 2008.

112. In August 2007, the Prison Legal News (PLN), a specialty periodical of general circulation in the prison community, ran as its cover story an investigation of Valley Fever at California prisons.[33]  The PLN cover story described in detail the source, exposure pathways, prognosis, and risk factors for the disease and its endemic presence in the subject California prisons.

113. CDCR itself published general-circulation memos in both 2006 and 2007 regarding Valley Fever at PVSP and other hyper-endemic prisons.

114. On information and belief, each Defendant named herein received copies of these and other information sources and in the normal course of their duties was required to read and understand both the conclusions and the underlying information available to CDCR management and staff regarding Valley Fever.

115. In 2007, CDCR Facilities Department Senior Management officials, including Defendant Deborah Hysen, stated that they were preparing measures to reduce the risk to inmates of contracting Valley Fever at PVSP.

116. The planned remedial actions included extensive measures to control inmates' exposure to contaminated soils outside buildings and greatly improved ventilation systems to limit the inmates' exposure inside the buildings.

117. Not a single element of this remedial plan was ever implemented until six years later, and only after two contested court orders forced CDCR to act. Reportedly CDCR management including Defendants concluded the remedial plan was "too expensive."

118. The planned remedial program was estimated to cost $750,000. California taxpayers have since spent $23 million treating inmates that became infected with Valley Fever as a result of Defendants' actions.

119. The New York Times quoted Defendant Yates in 2007 regarding the Valley Fever epidemic at his prison, in a story on Valley Fever at California prisons.

---

[33] "*California Prison Beset by Deadly Valley Fever Epidemic*," Prison Legal News (June, 2008), Vol. 19, p. 22.

Yates surmised to the Times that inmates and staff at PVSP contracted the disease by breathing in spores from the air as they "walk around out there."[34]

120. Defendant Yates was clearly aware of the risks and the exposure pathways subjecting inmates at PVSP to Valley Fever.

121. In June 2007 the California Department of Health Services (CDHS) offered specific recommendations for reducing Valley Fever incidence among CDCR inmates. The CDHS recommended that CDCR should consider relocating all inmates "from this institution [PVSP] to institutions with rates of cocci equal to or better than their local community rates."[35]

122. Despite their actual knowledge of the presence, the risk, and the appropriate remedial actions, Defendants took little or no action to address the unacceptable risks to CDCR inmates including the Plaintiffs at these prisons or to keep susceptible inmates away from the risk.

123. In April, 2012, the California Correctional Health Care Services (CCHCS) released a report titled, "*Coccidioidomycosis in California Adult Prisons, 2006-2010.*"  The Report received general circulation among CDCR staff including specifically Wardens and Unit Managers and executives.

124. The CCHCS Report found that CDCR had done nothing between 2006 and 2010 that had any effect on cocci incidence rates at PVSP and ASP.

125. The Report reiterated that Valley Fever incidence rates at the hyper-endemic prisons were drastically elevated and that African-Americans in particular were at increased risk of contracting Valley Fever and of suffering its lethal form. The Report found that African-American inmate men died from cocci at far higher rates than un-incarcerated African-Americans in California and much higher rates than the general inmate population.

[34] "*Infection Hits a California Prison Hard*," New York Times, December 30, 2007.

[35] *Winslow Recommendations*, June, 2007.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

126. The CCHCS Report found that PVSP in particular had extensive areas of un-stabilized soil on its grounds, posing an extreme risk of spore release, transport, and infection and noted that simply "…planting lawns and paving roads reduced the rate of coccidiodal infection by one-half to two-thirds," based on results at a military installation that had been studied.

127. The Report concluded that "the incarceration of individuals . . . in prisons within the endemic areas will continue to provide a stream of challenging and costly cases of coccidioidomycosis."

128. In addition to the massive numbers of inmates infected with Valley Fever, over 80 CDCR facility staff members have contracted Valley Fever to date, and at least one CDCR corrections officer has died from the disease.

129. Defendants in the CDCR Classification Services Unit were in possession of some or all of the above-described information regarding Valley Fever incidence at the hyper-endemic prisons and were aware that endorsing or transferring any inmate to one of the hyper-endemic prisons posed an extremely high risk of contracting Valley Fever.

130. As discussed above, each named Defendant possessed at all relevant times sufficient information that exposure to the spore-infested soils at the hyper-endemic California prisons posed an unacceptably high risk of Valley Fever infection, illness, and potentially death, to inmates including Plaintiffs located at those prisons.

131. At all times, Defendants had access to sufficient information concerning each Plaintiff's age, racial composition, and medical status, as part of the inmate's central file, and were required to possess and consider that information for purposes of appropriate housing determinations.  Defendants nevertheless took no action, either to exclude at-risk inmates from the hyper-endemic prisons or to make those prisons safer for the high-risk inmates.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

## V. THE PRISON TRANSFER SYSTEM

### V(a)

### Defendants Could have Transferred Susceptible Inmates Away from Danger.

132. Defendants had the ability to divert all at-risk individuals away from the high-risk prisons in its initial facility assignment process.

133. CDCR had at all relevant times robust, systematic procedures to match inmates to facilities, but Defendants failed to use or to adapt those procedures to identify at-risk inmates or prevent their assignment to the hyper-endemic prisons.

134. The classification scoring system that drives CDCR's housing placement decisions is governed by Title 15, § 3375(b), and includes the flexibility to include the inmate's personal attributes and risks to an inmate's health.

135. When new inmates first enter the custody of CDCR, they undergo an initial review process designed to assign the inmate to an appropriate long-term custodial facility.

136. CDCR refers to the initial review as the "Reception and Classification Process" (RCP). Inmates are housed at a temporary custody facility during the RCP, which may take as much as four months.

137. The RCP includes direct observation of the inmate and a review of an inmate's relevant personal history and personal factors, including the age of the inmate, the nature of the offense, prior incarceration history if any, and other relevant personal factors

138. At the end of the RCP, an inmate is given a classification score. The inmate then participates in a classification committee review, after which the inmate is recommended for placement at a specific institution based on their score and the committee findings. An inmate's geographical preference may but is not required to be taken into account in the assignment, for example for family proximity.

139. The inmate's classification security score generally dictates the security level of the institution the inmate is assigned to.  Facilities are designated as Level I (lowest security) through Level IV (highest security.)

140. Level I Facilities generally are open dormitories with a low-security perimeter.  Level II Facilities are open dormitories with a secure perimeter which may include armed guarding.  Level III Facilities have a secure perimeter with armed coverage; housing units or cells may be adjacent to exterior walls.  Level IV Facilities have a secure perimeter with internal and external armed guarding and cell block housing separated from exterior walls.

141. After an inmate receives the classification committee's initial assignment to an institution, an official in a separate office within CDCR must approve the assignment.  This official is referred to as the Classification Staff Representative (CSR).

142. After a final review of the inmate's case factors, the CSR reviews and approves the inmate's assignment to a specific institution. This process is called "endorsement."

143. Endorsement to an institution may take an additional 45-60 days.  The inmate may also have to wait for a bed to be available at the endorsed institution, which may take additional time.

144. Finally, a separate committee at the destination facility called the Unit Classification Committee (UCC) reviews initial program assignments, as well as all transfers at the facility. The UCC is composed of three staff members and is chaired by an official at the level of Facility Captain or Correctional Captain.

## V(b)

**Existing Procedures Could Easily Have Been Adapted to Prevent At-Risk Individuals from Receiving Initial Assignment to Hyper-Endemic Prisons.**

145. At any point during CDCR's redundant, protracted, multi-level and multi-factor inmate classification, assignment and review process, any of the

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

Defendants involved in that process had the ability to incorporate a simple screen to identify inmates at risk for Valley Fever and to divert those individuals from hyper-endemic prisons.

146. CDCR's inmate classification and assignment process uses standardized forms and procedures to review numerous personal factors regarding each inmate, ostensibly in order to assign inmates only to suitable facilities.

147. At any of numerous points in this process, those Defendants could have implemented simple procedures – for example, by adding a check-box to any of several standardized forms that are used in the process – to identify African-American, Asian, Hispanic, and older inmates who were particularly susceptible to Valley Fever and divert these from hyper-endemic prisons.

148. Although these Defendants knew by 2005 that any such individuals were in substantial danger, the Defendants failed to incorporate any screen for risk factors for Valley Fever into the RCP or assignment processes in order to divert susceptible inmates, including Plaintiffs, to locations where they would not be exposed to greatly increased risk of infection.

## V(c)

**Defendants Could Have Utilized CDCR's Routine Periodic Review Process to Identify Plaintiffs for Transfer to Safer Facilities.**

149. CDCR conducts a periodic review, typically on an annual basis, of each inmate to assess the continued suitability of the inmate's current custodial facility.

150. Periodic review is performed for each inmate by a facility staff member, typically a counselor, to determine if an inmate meets certain criteria to have his or her placement score changed and if the facility remains suitable.

151. In addition, a staff committee called the Unit Classification Committee (UCC) periodically reviews the status of every inmate at every institution. Inmates

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

appear personally before the UCC, typically on an annual basis, to adjust their classification score and re-evaluate their housing status.

152. During the periodic review, every aspect of an inmate's status at a facility, including program participation, work groups, custody designation, and the advisability of transfer out of the facility, is reviewed by the Counselor and the UCC.

153. Defendants within CDCR management and at the facility-level, as identified herein, had the ability to incorporate procedures into the periodic facility-level and UCC review to identify any African-American, Asian, Hispanic or older inmates susceptible to Valley Fever and to transfer those individuals, including Plaintiffs, away from the dangerous prisons.

154. Defendants declined to take even these simple steps to protect at-risk inmates including Plaintiffs from the known serious dangers at the hyper-endemic prisons.

## V(d)

### Defendants Had the Capacity to Transfer Plaintiffs to Safer Prisons.

155. Once identified, susceptible individuals already resident at hyper-endemic prisons including the Plaintiffs could have been transferred out of danger using CDCR's existing transfer processes.

156. At-risk inmates could have been transferred from hyper-endemic prisons facilities to other California facilities, either state or federal, or to out-of-state facilities under existing transfer procedures and agreements pursuant to Title 15, § 3379 of the California Code of Regulations.

157. CDCR "routinely transfers hundreds or thousands of inmates on a weekly basis" using these regulations and established procedures.[36]

158. Those procedures include provisions for voluntary and involuntary transfers and for transfers both within and outside CDCR.

---

[36] *Plata* Order at p. 5, fn. 3 [Docket 2661].

159. Inmates can be transferred not only to other CDCR correctional facilities, but can also be transferred to out-of-state correctional facilities, or to federal facilities in California, under the established transfer procedures found in Title 15, §§ 3379(a) *et seq.*

160. Every male inmate is potentially eligible for transfer to an out-of-state facility, either voluntarily or involuntarily.  Inmates transferred out of state remain under the legal custody of CDCR.

161. The transfer procedure even allows for temporary placement of inmates in facilities or levels for which they are not endorsed, due to medical conditions, and includes provisions for resolving any pending disciplinary issues prior to transfer.[37]

162. Inmate transfers may be ordered by CDCR executive or administrative staff or can be initiated at the facility level. At the facility level, either a Warden or the UCC committee at a facility may on their own initiative arrange for inmate transfers. Each of the Defendants identified herein as CDCR or facility-level line management had the ability at the least to initiate appropriate inmate transfer.

163. Further, any warden or supervisor can temporarily suspend a pending inbound transfer.[38]

164.  Each of the Defendants identified as a warden at the hyper-endemic prisons, or any UCC committee members, or supervisors, and the CDCR executive management, could therefore at any time have initiated procedures to transfer at-risk inmates including Plaintiffs away from the high-risk facilities. The Defendant wardens and supervisors, knowing the risks to inmates, could also have suspended the in-bound transfer of at-risk inmates including the Plaintiffs into the hyper-endemic prisons.

---

[37] *See* Title 15, §§ 3379(b), 3379(c).

[38] Title 15, § 3379(a)(4).

165. Defendants, knowing that Plaintiffs faced greatly increased risks of contracting Valley Fever at those facilities, failed to take any of these actions to prevent Plaintiffs' exposure or to protect Plaintiffs from the danger.

## V(e)
### Plaintiffs Could Have Been Transferred to Out-of-State Prison Facilities If Necessary.

166. CDCR maintains a separate office called the Contract Beds Unit (CBU) to administer the already-substantial volume of inmates CDCR transfers to out-of-state facilities.

167. Former Governor Schwarzenegger's 2006 Proclamation and Assembly Bill 900, the Public Safety and Offender Rehabilitation Services Act, provided authority for CDCR to transfer any inmates to private prison facilities in other states. CDCR began to transfer inmates to out-of-state facilities under this authority in October 2006.

168. Between 2006 and 2009, CDCR announced the transfer of thousands of inmates to out-of-state correctional facilities to relieve prison over-crowding. CDCR put out numerous press releases celebrating its successes with out-of-state transfers during this time, including:

- *"Governor Uses Executive Authority to Relieve Prison Overcrowding, Proclaims Emergency to Allow Inmate Transfer"* (10/04/06)

- *"CDCR Resumes Temporary Out of State Inmate Transfers"* (6/4/07)

- *"CDCR Continues Temporary Out of State Inmate Transfers"* (7/20/07)

- *"CDCR Contracts for Additional Out of State Beds to Reduce Overcrowding"* (10/05/07)

- *"Moving Inmates Out-Of-State Reduces Prison Overcrowding"* (4/21/08); and

- *"CDCR Amends Contract to House More Inmates Outside of California"* (11/2/09).

169. Under existing regulatory procedures and contractual arrangements, the CDCR can place California inmates in one of four out-of-state correctional facilities: two in Arizona, one in Oklahoma, and one in Mississippi.

170. These out-of-state facilities are capable of housing inmates with any security classification level including higher-custody levels that are not eligible for low-security facilities.

171. CDCR has already arranged to house at these facilities over 10,000 inmates transferred out of California prisons.

172. In 2009, as part of the ongoing plan to reduce prison overcrowding, CDCR amended its existing agreement with the Corrections Corporation of America (CCA) to expand the capacity for transfers of inmates out of state. The 2009 addendum allowed CDCR to add an additional 2,336 out-of-state beds for California inmates, for a total of 10,468 beds.

173. Scott Kernan, CDCR Undersecretary for Operations, stated that, "[o]ur ability to place offenders out-of-state offers us much needed flexibility in placement of offenders that ultimately creates a safer environment for inmates, our staff and for the public."

174. CDCR's "ability to place offenders out-of-state" could just as easily have been utilized to transfer at-risk inmates away from the known dangers of Valley Fever at hyper-endemic prisons.

175. CDCR had existing mechanisms, procedures, and capacity to remove every at-risk inmate away from the known danger of contracting Valley Fever.

176. Although Defendants knew by no later than 2006 that inmates including African–Americans, Hispanics, Filipinos and other Asians, and older inmates were at extreme risk of contracting Valley Fever at hyper-endemic prisons, Defendants never attempted to divert or transfer Plaintiffs, who Defendants knew were members of

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

high-risk groups, away from the known danger.  Defendants did nothing to divert or to remove Plaintiffs from the facilities where they were in mortal danger.

## VI.
### DEFENDANTS' KNOWING, RECKLESS CONDUCT JUSTIFIES AN AWARD OF PUNITIVE DAMAGES

177. Each of the Defendants acted knowingly, deliberately, and recklessly to deprive Plaintiffs of their constitutional rights by placing and keeping Plaintiffs in situations of unreasonable risk of substantial harm.

178. Despite numerous, repeated and explicit warnings about the danger of Valley Fever at the hyper-endemic prisons, and especially the danger to those individuals  identified as high-risk for the disseminated disease, Defendants failed to take any of the reasonable and obvious steps needed to protect those in their charge, and in fact knowingly took actions that increased the risk to Plaintiffs.

179. Defendants took no action whatsoever to mitigate Plaintiffs' exposure to Valley Fever at their prisons until 2011 when, after multiple contested court orders, CDCR finally took the token action of spraying a temporary sealant on some soils at PVSP.[39]

180. It was not until March of 2013 that Defendants finally installed minimal dust control devices – air filters and door sweeps – in some of the prison facilities.[40]

181. The consequence, according to expert testimony in *Plata*, was that ". . . avoidable inmate deaths are occurring as a result."[41]

182. Defendants knew that Valley Fever has no cure and requires a lifetime of treatment, that inmates had died from Valley Fever infections they contracted in

---

[39] *See* Deborah Hysen Declaration, May 6, 2013, ¶ 3**.**

[40] *See* Hysen Declaration ¶¶ 4-5.

[41] Galgiani Declaration, April 25, 2013 [Docket 2598], ¶ 2.

custody, and that identifiable groups suffer the severe form of the disease at much higher rates.[42]

183. Defendants admitted in pleadings in *Plata* that no one in CDCR took the steps necessary to mitigate the threat of harm posed to prisoners in Plaintiffs' high-risk groups at the hyper-endemic prisons between the years 2006 and 2011.[43] Defendants took no action to protect Plaintiffs even though all CDCR's management were aware "that Valley Fever presents a serious risk to inmate health."[44]

184. Defendants declined to take even simple actions like planting ground cover as had been recommended by the California Department of Health, even though ground cover "was demonstrated to be effective at reducing airborne spores by military operations during World War II."[45] Instead they waited until compelled by court order in 2011 and even then deployed a minimal soil sealant with an estimated two-year life span.[46]

185. In April 2012, the Receiver completed a study with several grim findings. Because of Defendants' years-long pattern and practice of ignoring the known heightened risk of disease to certain groups of inmates, at least 355 prisoners

---

[42] See, e.g., Kanan Memo, p. 3: "The risk and incidence of disseminated disease are highest in American Indians, Asians, Blacks, and immunocompromised individuals, including those taking chronic steroids."; *see also*, CDCR October 27, 2006 Memo; Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews (September, 1961), 25(3), at p. 314, and fns. 5, 27.

[43] *See* Defendants' Opposition brief in *Plata*, May 6, 2013, Docket 2618, pp. 3-4.

[44] *Id.*, at pp. 13.

[45] *Plata* order, June 24, 2013, Docket 2661, p. 5:18-23; *see also* Starr, "*Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California*," CDCR Memorandum June, 2007 [internal page 1, recommendation 1].

[46] *See* Deborah Hysen Declaration, ¶ 3.

required hospitalization due to Valley Fever infection from 2008-2010, and 27 prisoners lost their lives to the disease between 2006 and 2010.[47]

186. The rate of deaths due to cocci among African-American inmates was eight times the death rate among African-Americans in California generally, and twice the death rate due to cocci among non-African-American inmates in California.[48]

187. Dr. Gil Chavez, California's State Epidemiologist and the Deputy Director of Infectious Diseases within California's Department of Public Health, concluded that "[a] factor that probably contributed to the high rates in [PVSP and ASP] is housing populations of inmates at risk for severe cocci disease, such as African-Americans and persons with diabetes and other chronic diseases."[49]

188. The court-appointed Receiver managing the California State prison system's health care program issued his "*Recommendations for Immediate Response to Coccidioidomycosis in CDCR Prisons*" in November 2012.[50]  Included among the Receiver's recommendations, formed in consultation with court-appointed medical experts, was the direction to cease transferring African-Americans, persons with diabetes and those with no HIV test results to PVSP and ASP.[51]

---

[47] *See* "*Coccidioidomycosis in California Department of Corrections and Rehabilitation Institutions,*" CCHCS Report, October 10, 2012, p. 2.

[48] *Id.*, pp. 5-6 ["For the year 2006-2007, African-American inmates were eight times more likely … to die of coccidioidomycosis than African-American men in the California population"].

[49] April 4, 2013 letter from Dr. Chavez to Acting CDCR Secretary for Operations Martin Hoshino, p. 1, ¶ 2.

[50] *Plata* order, June 24, 2013, p. 9 [Docket 2661].

[51] *Id.*

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

189. On April 11, 2013, the Receiver's staff experts concluded a further analysis of the Valley Fever epidemic in the PVSP and ASP facilities.[52] Their report found that African-Americans were at 90% higher risk for disseminated cocci disease than their fellow white inmates, and "other race" categories (e.g., Asian, Native-American) were at 100% increased risk; inmates over 55 years of age bore an increased risk of at least 60%.[53]

190. Even after Defendants had this analysis in hand, the Receiver still had to repeat his order to the defiant CDCR on April 29, 2013, amended on May 1, 2013, as the Defendants continued to refuse to exclude from the hyper-endemic prisons inmates such as Plaintiffs who had clearly-identified high-risk attributes, including African-Americans and those potentially at risk due to medical conditions or lack of medical data.[54]

191. In their May 23, 2013 report, the medical experts appointed by the District Court in the *Plata* case found that 36 inmate deaths were caused by Valley Fever between 2006 and 2011. Of those deaths, 70% were African-American.[55]

192. Those same medical experts underscored the importance of excluding from PVSP and ASP "all populations that meet the American Thoracic Society criteria for increased risk of severe cocci disease (e.g., African-Americans, Filipinos) … [as well as] individuals whose HIV status is unknown[.]" [56] They also concluded

[52] Kelso, "Notice Of Filing Of Report And Response Of Receiver Regarding Plaintiffs' Motion Re: Valley Fever," *Plata v. Brown*, Eastern District California No. 01-1351 [May 1, 2013, Docket 2601].

[53] *Id.*

[54] *See* Kelso Report, pp. 9-11.

[55] *See* Plata v. Brown, ED 01-1351 [Judge Henderson Order, citing Court Medical Expert Report, "Cocci in California State Prisons," p. 5 [Docket 2661, "Henderson Order"].

[56] Henderson Order, p. 12 [Docket 2661].

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

that, "if measures taken do not reduce cocci rates to near local community rates, [CDCR] should close PVSP and ASP."

193. Despite the Receiver's specific instructions and the court-appointed medical experts' opinions, for reasons known only to Defendants, "CDCR has continued to refuse to exclude the other inmates covered by the Receiver's policy – most notably, diabetics and African-American and Filipino inmates[.]"[57]

194. Defendants repeatedly defied the Receiver's explicit instructions, complaining that the directions to exclude the identified at-risk inmates were too "vague" or "premature."[58]

195. According to Dr. Galgiani, "[t]he incidence of Valley Fever at these two prisons is at a level indicating a public health emergency.… and prison officials should be, but apparently are not, acting in a manner consistent with a situation where the lives of individuals are at substantial risk."[59]

196. Galgiani concluded that, as a result of the California prison system's inadequate handling of the Valley Fever epidemic among inmates, "needless suffering and death were inflicted on these men."[60]

197. In spite of repeated warnings from experts including those on their own staffs, Defendants continued to send high-risk prisoners to the hyper-endemic

[57] Henderson Order, citing Court Medical Expert Report, "Cocci. in California State Prisons," p. 11.

[58] Declaration of Diana Toche, May 6, 2013, ¶¶ 11-14 [Docket 2615]; Declaration of Warren George, pp. 5-6 [email thread with relevant commentary by Deputy Attorney General Benjamin Rice dated May 3, 2013]; May 8, 2013 letter from Dr. Diana Toche to J. Clark Kelso.

[59] Galgiani Declaration, ¶ 15.

[60] Galgiani Declaration, ¶ 19.

facilities and declined to implement at those facilities any of the recommended remedial measures to protect inmates.[61]

198. The *Plata* Court found that: "The experts [all] agree that the factors for increased risk of severe cocci are well-known and undisputed, and that screening out high-risk inmates is an appropriate response. … Defendants are unwilling to exclude [certain] inmates whom they know are at an increased risk of severe disease, which may lead to death. Defendants have therefore clearly demonstrated their unwillingness to respond adequately to the health care needs of California's inmate population[.] …"

199. The *Plata* Court noted that "the recommendation to exclude inmates at higher risk of severe cocci was first specifically made to Defendants over **six** *years* **ago**."[62] Defendants' deliberate failure to take any action to protect Plaintiffs, who were known to be at elevated risk of contracting the severe, disseminated form of Valley Fever, in the face of a duty to act, constituted a reckless indifference to Plaintiffs' 8th Amendment rights.

200. For all the reasons stated herein, Defendants' indifference to Plaintiffs' endangerment and suffering has been willful and with conscious disregard for Plaintiffs' safety, health, and constitutional rights. Defendants' conduct was purposeful, willful, deliberate, and inhumane, and warrants an award of exemplary and punitive damages so as to punish Defendants for their wrongful acts and to deter future similar misconduct.

---

[61] See, e.g., Dovey "*Inmate Patients at High Risk*," [CDCR Memo August 3, 2006]; Hubbard & Winslow, "*Exclusion of Inmate-Patients* [CDCR Memo November 20, 2007]; *Plata* order, p. 5, June 24, 2013, Docket ["Notably, although CDPH observed the increased risk for African-Americans and Filipinos, PVSP did not transfer these inmates out."]

[62] *Plata* order, p. 20 Northern District Judge Thelton Henderson, filed June 24, 2013, Docket 2661, (*emphasis added*).

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

## VII.

## PLAINTIFFS

## FREDRICK BEAGLE

201. Fredrick Beagle is a 41-year-old Caucasian male from Upland, California. He has a GED and worked at a variety of jobs prior to his sentence.

202. Beagle was assigned to Avenal State Prison to serve a 5-year sentence. He had significant health problems before he was endorsed to ASP.

203. Prior to his incarceration, Beagle had elevated liver enzymes suggesting a compromised liver, blood clots in his legs, lower back pain, gout, and chronic pain from skin grafts.

204. Beagle was formally diagnosed with disseminated Valley Fever in March 2013. Now, in addition to his pre-existing medical conditions, he has aching joints, back pain, severe headaches, night sweats, inflamed rashes on his head and legs that do not respond to treatment, chest pain, and fatigue. He must take 200 mg of Fluconazole twice daily to try to keep the disease from spreading further.

205. Beagle submitted several 602 complaints, through January 2012, which prison officials failed to respond to. Mr. Beagle is no longer in custody so he is not required to exhaust CDCR's administrative appeals process.

206. Mr. Beagle is of limited means and has been unable to afford either the medication or medical exams necessary to monitor and control his disease. He has a very reasonable fear that the disease will spread further and be increasingly painful, and could lead to meningitis which would be fatal.

207. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Beagle's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all

relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

### DON BELARDES

208. Don Belardes is 40 years old, of Native American and Spanish descent. He was born in South Bend, Indiana and raised in San Jose, California. Mr. Belardes is currently married and has two sons. He held a number of jobs prior to incarceration including in construction. Mr. Belardes achieved his GED and has attended junior college for one year.

209. Mr. Belardes was transferred to PVSP in May 2010.

210. Prior to his incarceration Belardes was slightly overweight but otherwise in good health. He contracted Valley Fever shortly after he was placed in administrative segregation at Pleasant Valley. The cells there, Mr. Belardes reported, were filthy with little to no ventilation. Mr. Belardes requested but was denied cleaning supplies for his cell. He began to occupy his time in segregation by exercising in his cell; after one week there he became ill.

211. Mr. Belardes was formally diagnosed with Valley Fever in October, 2011. His symptoms at that time included night sweats, fluid in his lungs, headaches, body aches, fever and chills.

212. The disease has since caused bronchitis and pneumonia which has been resistant to treatment. Belardes has suffered severe back pain and spasms for over a year for which he requested but was denied any medical care.

213. Mr. Belardes was diagnosed with hepatitis but the treatment for that disease cannot be administered because of his Valley Fever. He has had a liver biopsy; his liver continues to degrade. Mr. Belardes is concerned about the prognosis for his hepatitis which reportedly was in stage 4 fibrosis and stage 2 inflammation.

214. Belardes asked for a medical transfer after he contracted Valley Fever but was denied, reportedly based on the opinion of Dr. Ho at the facility. Dr. Ho told

Mr. Belardes he would not "get it again;" Ho then discontinued the prescription for Mr. Belardes' Valley Fever medication.

215. Mr. Belardes exhausted the administrative appeal process for his injuries.

216. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Belardes's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

### FLOYD BOYD

217. Floyd Boyd is a 49-year-old African-American. He is married with children. He was previously employed at various jobs including housekeeping at CMC Hospital in Fresno, California.

218. Mr. Boyd was transferred to PVSP from Salinas Valley Prison in 2012 and remained at PVSP until his recent release.

219. Boyd was formally diagnosed with Valley Fever on September 11, 2013. His symptoms included persistent coughing, severe headaches, joint pain, loss of appetite and weight loss. He used to be very active but is no longer able to exert himself without severe pain.

220. While he was incarcerated, Mr. Boyd was prescribed and received 200 mg of Fluconazole daily to control the spread of the disease. He is unable to afford this medication now that he is paroled.

221. Mr. Boyd continues to experience coughing, night sweats, joint pain, headaches, fevers and chill. Without appropriate medical care his condition is expected to deteriorate rapidly.

222. Because Mr. Boyd is no longer incarcerated he is not required to exhaust CDCR's administrative appeals process.

223. Boyd timely filed a claim with the Victim Compensation and Government Claims Board (VCGCB ) on January 22, 2014, less than six months after the statutory date of injury.

224. In the event that Mr. Boyd's VCGCB claim is not deemed sufficient, Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Boyd's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

## RICHARD BURKE

225. Mr. Richard Burke is a 52-year-old caucasian male from Orange County, California. He was orphaned at 16 but remains close to his five siblings. Mr. Burke worked in the construction industry.

226. Burke was transferred to PVSP from Delano in January 2010. His CDCR classification score at the time was zero, indicating extremely low risk.

227. Mr. Burke reportedly was sentenced to prison for robbery of food from a supermarket.

228. Burke developed golf-ball sized lumps on one leg and swelling under both arms in February 2012 and was diagnosed with Valley Fever shortly afterward.

229. Burke has been treated with Fluconazole and Ranitidine. He continues to suffer lesions on his arms and legs and swelling and skin rashes all over his body. He has shortness of breath and constantly aching joints.

230. He still fears he may lose his leg, as in advanced cases amputation may be the only effective treatment option for Valley Fever infections in the bones.

231. Prior to contracting Valley Fever, Burke was active and worked out every other day.  Now he runs out of breath quickly and becomes exhausted with even minimal exertion. His doctor has stated he will need to take Fluconazole for the rest of his life.

232. Mr. Burke is no longer in custody and is therefore not required to demonstrate exhaustion of CDCR's administrative appeals process.

233. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Burke's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501.  At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

### JOSEPH BUSTAMONTE

234. Joseph Bustamonte is a 30-year-old Hispanic male from Salinas, California.  Prior to his incarceration he was a single father and lived with his daughter and his sister and nephew.  He was employed by a construction company and also attended continuing education courses to complete a college degree.

235. Bustamonte was transferred to PVSP from North Kern State Prison on December 9, 2010. He was generally healthy at the time.  Mr. Bustamonte was formally diagnosed with Valley Fever on or about July 30, 2011.

236. Bustamonte had developed golf-ball-sized lumps in different locations on his arms and legs as well as swelling of all his extremities causing excruciating pain.  By the time he was diagnosed and treatment started, the disseminated infection caused his legs to be so inflamed and swollen he was unable to walk. He also suffered night sweats and chills.

237. Despite these severe and characteristic symptoms, Mr. Bustamonte had to specifically request a Valley Fever test. If not for his request the disease would not have been diagnosed and his treatment delayed even longer. Facility medical staff told Mr. Bustamonte that the 2" lumps on his arms and legs were bug bites.

238. Despite the excruciating pain and textbook symptoms of the disease, facility staff still did not give Mr. Bustamonte appropriate medication for his Valley Fever. He was eventually given a prescription for Flucanozole.

239. Mr. Bustamonte is no longer incarcerated and is not required to exhaust CDCR's administrative appeals process.

240. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Bustamonte's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

### CHARLES CARTER

241. Charles Carter is a 42-year-old African American from Los Angeles. He is a high school graduate and has two children.

242. Carter was transferred to PVSP from CMC State Prison in March 2011.

243. He was formally diagnosed with Valley Fever in June 2012. At that time he had severe headaches, incessant coughing, high fever, night sweats, aching in the bones and joints of his hands, feet, legs, and neck, as well as large areas of skin rashes and trouble breathing. He was repeatedly denied the testing for Valley Fever that he requested. He eventually contracted pneumonia and a 105-degree fever before he was correctly diagnosed.

244. Before his transfer to PVSP, Carter was in good health. By the time the Valley Fever was diagnosed, the disease had spread so extensively that Carter was prescribed a shelf full of medications including Fluconazole, Itraconzole, Ketoconazole, Guaifenesin, Dextromethorphan, Azithromycin, inhalers and pain medication.  Doctors have informed Carter that he will have to take at least some of these medications for the rest of his life.

245. Carter exhausted all available and necessary administrative remedies on or about October 25, 2013.

246. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Carter's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501.  At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

### OTHA CLARK

247. Otha Clark is a 27-year-old African American from Richmond, California.  He earned a high school diploma while incarcerated.

248. Mr. Clark was transferred to PVSP from Pelican Bay State Prison in 2009 reportedly because his classification level was reduced.  Before his transfer to PVSP, Clark had asthma and high blood pressure.

249. Clark repeatedly requested transfer to another prison but his requests were denied.

250. Clark appears to have contracted Valley Fever on or around December 10, 2010. He suffered from fevers, shortness of breath, burning sensations in his chest and throat, weight loss, night sweats and severe coughing spells. Mr. Clark was not

given any treatment for these conditions until after he was formally diagnosed with Valley Fever in February 2011.

251. Since then, he has been admitted to the hospital over twenty times in the past year alone and almost died four times from disseminated Valley Fever infections. He was prescribed Fluconazole and Itraconazole.

252. Clark continues to suffer from persistent coughs, fevers and night sweats. He coughs up blood. He has trouble eating and drinking and struggles to maintain weight. Physicians, including the prison physician Dr. Wilson, have informed him that he will have Valley Fever for the rest of his life and will likely die within five years if the virus continues to spread in his brain and spine. Clark suffers severe stress and anxiety from fears that the disease will kill him prematurely.

253. Clark exhausted all available and necessary administrative remedies on or about November 21, 2013.

254. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Clark's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

**DONALD DIBBLE**

255. Donald Dibble is a 35-year-old Caucasian male from Sacramento, California, with chronic asthma. Prior to his incarceration he worked in the construction industry.

256. Dibble was at Avenal State Prison in August, 2012 when he began to experience intense pain in his back, shortness of breath, coughing, fatigue, bone and

joint aches, congestion in his lungs and increased difficulty breathing. He was hospitalized and treated with Fluconazole.

257. Mr. Dibble is afraid that the Valley Fever will prevent him from being able to work in construction and take care of his children.

258. Dibble had requested transfer away from ASP but was denied.

259. He is no longer incarcerated and is therefore not required to exhaust CDCR's administrative appeals process.

260. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Dibble's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

### JEROME FELDER

261. Jerome Felder is 36-year-old African American. He was transferred to PVSP in August 2011. His health was generally good at that time.

262. In December 2011, he began to experience chills, coughing, widespread itching, pain in his bones and his knee and elbow joints, and severe weight loss. He was formally diagnosed with Valley Fever in January 2012 and was prescribed Fluconazole, Hydroxyzine, Citalopram hydrobromide, Hydrochlorothiazide, and Lisinopril.

263. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Felder's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's

Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

## CANDELARIO GARZA

264. Candelario Garza is a 59-year-old Hispanic male from Harlington, Texas. He is a high school graduate, an Army veteran, and fought in Korea.

265. Mr. Garza was transferred to PVSP in June 2007. Before his transfer to PVSP, Garza had Hepatitis C AND a compromised immune system with low platelet counts and damage to his spleen.

266. Mr. Garza was formally diagnosed with Valley Fever on December 14, 2010. He had been on a work crew at PVSP.

267. Since that time he has developed pneumonia and Chronic Obstructive Pulmonary Disease as well as blood clots in his legs and his lungs. He is longer able to work in the prison.

268. Mr. Garza is currently prescribed a maximum tolerated dosage of Fluconazole, and Warfarin for recurring blood clots due to the disease.

269. He requested to be transferred away from PVSP but was denied. His condition worsened and in April 2012 he was transferred to the California Medical Facility.

270. Physicians have informed Garza that the Valley Fever is disseminated, that he will have it for the rest of his life and it is likely to lead to his death.

271. He suffers chronic stress and anxiety from the fear that the Valley Fever is going to cause his death.

272. Garza exhausted all available and necessary administrative appeals.

273. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Garza's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

### JEREMY HOLLIS

274. Jeremy Hollis is 40-year-old caucasian male from San Louis Obispo. He is married and has three children. He is a former Marine. Hollis owned a general contracting business and completed two years of college.

275. Prior to his incarceration he was healthy; he ran every day. He was transferred to PVSP in December 2010 reportedly because his previous facility was terminating the use of its dayroom for beds. Hollis appealed to block the transfer, and won that appeal, but he was transferred to PVSP anyway.

276. In January 2001, within two months of his arrival at PVSP, he noticed the onset of symptoms including shortness of breath, night sweats, chills, burning in his lungs, and chronic fatigue. He was bedridden and could not walk a single lap around the yard.

277. Hollis was told he had Valley Fever but was not formally tested. He was placed on Fluconazole, Antibiotics and Acetaminophen for six months. He was subsequently told that the staff had mixed up his file with that of another inmate and he did not have Valley Fever. He immediately requested to be tested for Valley Fever but was denied. He continues to have shortness of breath and recurrence of his symptoms. Hollis requested a transfer away from PVSP but was denied.

278. Hollis exhausted all available and necessary administrative remedies.

279. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Hollis's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's

Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

## SCOTT IMUTA

280. Scott Imuta is a 47-year-old Japanese American male from Los Angeles, California. He completed two years of college at the University of Southern California.  He is a journeyman electrician.

281. Imuta was housed at PVSP from 2005 to 2009 and CTF from 2009 through 2013.  In October 2013 he was released from prison.

282. Before his transfer to PVSP, Imuta was a strong, 165-pound man. He was mentally and physically alert and vibrant.

283.  Imuta first exhibited Valley Fever symptoms in December, 2010 at Soledad State Prison, though he believes he contracted the ailment at PVSP.  He suffered with chills and cold sweats.  At first, he believed he had contracted pneumonia.  He was hospitalized twice in the December 2011.  No tests were run to see whether he had Valley Fever.

284. Imuta was formally diagnosed with Valley fever in March 2012, after an X-ray showed a triangular mass in his right lung. A blood test confirmed that Imuta was infected with cocci and indicated a strong likelihood that the disease had disseminated throughout his body.

285. Imuta became sicker but CTF medical staff did not continue his medical care; in fact, they told him he had a flu and refused to test him further. Imuta nearly died from the disease. He survived after multiple hospitalizations.

286. His immune system is now compromised, and he has contracted hepatitis and constant staph infections. His vision has degraded and his hearing is impaired. He coughs constantly and has very high blood pressure. He now suffers from severe depression.

287. Imuta is prescribed Fluconazole and Sulfamethoxazole to slow the progression of the disease. He suffers from constant stress and anxiety from the fear that this disease will kill him prematurely.

288. Imuta requested to be transferred away from PVSP but prison officials including Defendants ignored or denied his requests.

289. Mr. Imuta is no longer in custody and is therefore not required to demonstrate exhaustion of the administrative appeals process.

290. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Imuta's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

## PLAINTIFF INFINITY

291. Infinity is a 66-year-old African American male from Texas. He was transferred to PVSP in May 2011. Before his transfer he suffered from hypertension and renal insufficiency. He was formally diagnosed with Valley Fever in October 2011.

292. The disseminated Valley Fever infection formed a cocci mass on his left side that required surgery. Disseminated cocci has also been detected in his spine.

293. He was prescribed fluconazole and has been informed he will require this medication for the rest of his life. Physicians have informed Infinity that the infection in his spine will likely continue to worsen.

294. He is of limited means and cannot afford to purchase the medication required to treat the disease. He does not know how he will get treatment or survive for long without medical care.

295. Defendants and the CDCR waived all defenses based on claim presentment with respect to Infinity's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501.  At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

### GEORGE JOHNSON

296. Mr. Johnson is a 31-year-old African-American from Moreno Valley, California. Before he was transferred to PVSP to serve a brief sentence, he was in excellent health and did not have any significant medical problems.

297. On February 15, 2012, Johnson was formally diagnosed with Valley Fever. He was prescribed 200 mg fluconazole

298. Since contracting the disease, he has been afraid to go outside. He has problems breathing and difficulty walking.  His bones ache and he is always tired.

299. Johnson will have to take medication for Valley Fever for the rest of his life. He will always face the threat that the disease will progress or worsen.

300. Johnson is no longer in custody. He is therefore not required to exhaust CDCR's administrative appeals process.

301. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Johnson's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501.  At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

**BRUCE KOKLICH**

302. Mr. Koklich is a 54-year-old caucasian male, raised in Tuolumne County, California. He has worked in the real estate field since 1982 and has held positions of increasing responsibility including in sales, marketing, account and asset management. Prior to arriving at PVSP he was in good health.

303. Koklich was formally diagnosed with Valley Fever on January 27, 2009.

304.  He has pain in his lungs, back and spine, in his left hip and both hands. He has skin lesions and brown rashes on his ankles, and swelling in his legs, and trouble breathing. In June of 2013, he suffered a seizure.

305. From September 2008 until May 2009, D-Yard Building 4 at PVSP was undergoing construction for an expansion project.

306. Koklich timely filed suit in Fresno County Superior Court. That suit was dismissed, without prejudice, for failure to exhaust administrative remedies.  There has been no final ruling in that action, which was appealed. That action asserts Koklich did timely exhaust all available administrative remedies, as the State failed to respond appropriately to his validly-filed 602 complaints.

307. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Koklich state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501.  At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

**GRADY MONTGOMERY**

308. Grady Montgomery is a 49-year-old African American.  He is married and has two children. He worked in auto sales for most of his career.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

309. Prior to PVSP, he was housed at CMC State Prison. He asked to be transferred to Folsom State Prison but was instead endorsed for transfer to SOL/WSP III. He appeared before the Institutional Classification Committee (ICC) on November 11, 2011 for transfer to SOL/WSP, but on January 1, 2012 was transferred to PVSP instead. No reason was given. Montgomery protested his transfer to PVSP because he is African-American and has chronic breathing trouble.

310. Before his transfer to PVSP, Montgomery suffered from chronic allergies, high blood pressure and back pain from an old injury.

311. He became ill sometime in or around August 2012. He was extremely weak and had night sweats, fever, coughing, rashes, pain in his chest, scaling skin, and extreme weight loss. He started throwing up blood.

312. Despite these symptoms and his repeated requests Montgomery was not tested for Valley Fever until over three months later. His symptoms worsened and he sought medical attention in November but was turned away again, reportedly because he did not have the correct paperwork. He submitted an emergency request for medical care and was formally diagnosed with Valley Fever in December 2012.

313. He was prescribed fluconazole, antibiotics and Ibuprofen.

314. Physicians have informed Montgomery that he will have Valley Fever the rest of his life. He has fluid on his lungs, pain in his body and joints, difficulty breathing, scaling skin, chronic itching and skin rashes. Montgomery is of limited means and cannot afford to purchase the medication he requires. He does not know how he will get treatment or survive for long without adequate medical care.

315. Montgomery exhausted all available administrative remedies on October 23, 2013.

316. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Montgomery's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

**PETER ROMERO**

317. Peter Romero is a 53-year-old Hispanic and Native American male.  He was employed as a machinist and carpenter and is working on obtaining his G.E.D.

318. Romero was transferred from PVSP to North Kern State Prison (NKSP) on September 3, 2010.  He is currently housed at CSP Lancaster and expects to be paroled in March 2017.

319. Before his transfer to PVSP, Romero had a compromised immune system due to a pre-existing Hepatitis C.

320. Romero exhibited Valley Fever symptoms in September 2010, shortly after having been from PVSP to NKSP.  He was hospitalized on September 30, 2010 and formally diagnosed with Valley Fever.  On June 23, 2011 he was retested and the diagnosis of Valley Fever was confirmed.

321. Romero was forced to undergo two surgeries as a result of Valley Fever, including surgery to his spine. That surgery left him with permanent nerve damage, continuous upper and lower back pain and restricted mobility. He requested but was not prescribed adequate medication for his constant pain.

322. Physicians have informed Romero that he will suffer from Valley Fever for the rest of his life.

323. Romero exhausted his 602 administrative remedies.

324. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Romero' state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501.  At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

## JOSH THOMAS

325. Josh Thomas is a 60-year-old African-American. He was born in Little Rock, Arkansas. He is the youngest of five children, most of which are now deceased. He completed ten years of formal education and then obtained a GED.

326. Prior to his incarceration, Thomas' immune system was already weakened as a result of chronic anemia, diabetes mellitus, kidney and liver cysts, and hepatitis A, B and C.

327. Thomas housed at California Substance Abuse Treatment Facility and State Prison at Corcoran (CSATF/CSP) until 2012.

328. Thomas was diagnosed with Valley Fever in January 2011, after his health worsened noticeably. He had persistent cough, dizziness, syncope, headaches and chest pains, night sweats, prolonged fever, chills and weight loss. There was also lymph node involvement and a nodule in his left lung.

329. Thomas was hospitalized at Mercy hospital in Bakersfield, California for a month because of the severity of his illness. He was prescribed Fluconazole, Xopenex and Flovent and will need lifetime treatment and medication.

330. Thomas requested transfer through the 602 process; his request was denied because, prison authorities wrote, "you are appropriately endorsed and housed." They also informed him that "he can request a transfer at his annual review."

331. Thomas protested his placement at PVSP and requested to be transferred out due to the risk of Valley Fever, but he was denied. His appeal was rejected at the third level, exhausting his available administrative remedies.

332. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Thomas's state law negligence claims, as those

entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

## AARON TILLIS

333. Aaron Tillis is a 30-year-old African American from Marin City, California.

334. Tillis was transferred from High Desert State Prison to PVSP in 2009. Before his transfer to PVSP, Tillis was in good health. In 2012 he was transferred to CSP Solano where he remains today.[63]

335. Tillis was formally diagnosed with Valley Fever on February 21, 2012. He suffers generalized body aches, night sweats, skin rashes and skin lesions, chronic fevers, and trouble breathing.

336. In attempts to treat the Valley Fever, Tillis has been prescribed Fluconazole, Adacel, Chlorpheniramine, Hydrochlorothiazide, Lisinopril, Mirtazapine, and Naproxen.

337. Tillis has exhausted his available and necessary administrative remedies.

338. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Tillis's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods

[63] Tillis reports that his classification score dropped to level two on February 17, 2011. CDCR rules then required him to be transferred from PVSP. Had CDCR followed those rules he would have been transferred away from PVSP before he contracted Valley Fever.

failed to identify either the required statutory officials or their addresses for service of claims.

### RENE VILLANUEVA

339. Rene Villanueva is a 26-year-old Hispanic male from Santa Paula, California.

340. Villanueva was transferred from Ironwood State Prison to PVSP in January 2011. He is currently housed in Folsom State Prison.

341. In 2007, medical staff at California Youth Authority documented that Villanueva had a low white blood cell count. In 2011, just prior to Villanueva's transfer to PVSP, he was given antibiotics to treat an infection. This condition and treatment increased Villanueva's risk of infection at PVSP.

342. Villanueva was formally diagnosed with Valley fever on September 22, 2011. He suffers severe pain throughout his entire body, weight loss, labored breathing, chest and lung pain, excessive coughing, and rashes and swelling of his lower legs. He was prescribed Fluconazole, a Levalbuterol inhaler, eye drops and additional medications.

343. Mr. Villanueva requested transfer from PVSP, but was denied.

344. He has exhausted his available and necessary administrative remedies.

345. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Villanueva's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501. At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

## BERTRUM WESTBROOK

**346.** Bertrum Westbrook is a 37-year-old African-American. He was born in Los Angeles, California.  He has one son.

347. Westbrook was transferred to PVSP in early 2009 and was formally diagnosed with Valley Fever in 2010.

348. His symptoms include recurrent fevers, chest and back pains. He was prescribed Fluconozole and Noxafix but had to be hospitalized; a specialist concluded that his medication was not strong enough and recommended Voriconazole.

349. The disease is disseminated; Westbrook continues to have physical aches in his joints that limit his movements, fevers, chest pain, nausea and back problems. He now also has cancer; treatment for both conditions is complicated as a result.  He is severely anxious and depressed about whether he is going to die because of his infection with the virus.

350. After learning about Valley Fever, Mr. Westbrook protested his placement at PVSP and requested an emergency transfer away from the prison but his request was ignored or denied.

351. Westbrook has exhausted the available administrative remedies.

352. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Westbrook's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501.  At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

## WAYNE WOODS

353. Wayne Woods is a 58-year-old African-American from Alabama. He is a veteran and has been employed as a salesman, coal miner, house painter and barber.

354. Woods was transferred from California Men's Colony to ASP on August 8, 2012.  Before his transfer to ASP, Woods had high blood pressure but was otherwise in good health.

355. Woods was formally diagnosed with Valley fever on October 30, 2012. He experiences night sweats, chills, fever, rashes and fatigue.

356. Woods was prescribed Fluconazole but had an allergic reaction to it and had to be switched first to Voriconazole and then to Posaconazole, second-line drugs. He continues to experience the symptoms of the disease.

357. Woods has exhausted the available administrative remedies.

358. Defendants and the CDCR waived all defenses based on claim presentment with respect to Mr. Woods's state law negligence claims, as those entities failed to comply with the statutory notice requirements under California Government Code § 53501.  At all relevant times, neither the Defendants nor the CDCR posted or maintained legally-adequate notice information in the California Secretary of State's Roster of Public Agencies. The CDCR Roster entries for all relevant time periods failed to identify either the required statutory officials or their addresses for service of claims.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

## VIII.

## FIRST CLAIM FOR RELIEF

## VIOLATION OF THE EIGHTH AMENDMENT

## (42 U.S.C. § 1983)

### (Reckless Exposure to Dangerous Condition)

### (Alleged Against All Defendants)

359.   Plaintiffs incorporate the allegations of paragraphs 1-358 as if these allegations were fully set forth herein.

360.   Each plaintiff is a human being.

361.   Each plaintiff had a federally-protected Eighth Amendment right to be free from cruel and unusual punishment, a right secured by the United States Constitution under 42 U.S.C. § 1983.

362.   Defendants acted under color of state law in that Defendants are state employees, operate the state prisons, and carry out the policies and practices described herein under the authority of California statute, regulation, and policy, to control Plaintiffs' lives, prison housing location and prison housing conditions.

363.   The Eighth Amendment prohibits inhumane methods of punishment and inhumane conditions of confinement.

364.   When the State takes a person into custody and holds him against his will, the Constitution imposes upon the State's responsible officials a corresponding duty to assume responsibility for that person's safety.   When state employees fail to provide for the needs of a confined individual, including reasonable safety and appropriate medical attention, they transgress the substantive limits on state action set by the Eighth Amendment.

365.   An Eighth Amendment violation is stated when officials can be shown to have known of and disregarded a substantial risk of serious harm to prisoners.

366.   It is cruel and unusual punishment under the Eighth Amendment to expose inmates to significantly increased risk of harm, including those arising from exposure to environmental agents that cause serious harm.

367.   Defendants knew of the greatly increased risks posed by exposure to Coccidiodomycosis at the hyper-endemic prisons.

368.   Defendants knew there was an ongoing, epidemic level of risk of serious harm to Plaintiffs and other prisoners were they to be placed and remain incarcerated in hyper-endemic prisons, and particularly at Pleasant Valley.

369.   Defendants had actual knowledge of the serious risk of harm to Plaintiffs but nevertheless ignored the risks, and exposed and continued to expose Plaintiffs to an unacceptably high risk of contracting Valley Fever by failing to adopt a policy that protected these high-risk inmates.

370.   Defendants' failure to adopt an appropriate exclusion policy, and subsequent ministerial actions incarcerating inmates including Plaintiffs at hyper-endemic prisons, and failure to take the required ministerial actions to make those prisons safe, and failure to transfer at-risk prisoners housed at those prisons away, and failure to supervise subordinates' actions, including in particular at PVSP, caused unconstitutional injury to Plaintiffs.

371.   Defendants' knowing, reckless, unlawful policies and negligent actions created and maintained an unacceptably high risk to Plaintiffs.  Defendants are liable for these unconstitutional policies and practices and negligent decisions because they personally participated in the promulgation, adoption, passage, continuation, or supervision of them.

372.   Through the policies and practices they adopted, promulgated, followed, and/or executed, Defendants knew or reasonably should have known that they would cause the unconstitutional deprivation of Plaintiffs rights.

373.   Specifically, under these policies and practices, officials did not exclude or transfer inmates away from the most dangerous prisons and continued housing

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

inmates including Plaintiffs at hyper-endemic prisons without regard to Plaintiffs' susceptibility or the greatly increased risks of infection.

374. Furthermore, Defendants negligently failed in their policy decisions and their ministerial duties to authorize and implement measures to reduce the risk at these prisons by providing ground cover, implementing soil stabilization, installing protective ventilation systems and other measures.

375. Defendants as supervisors knew with substantial certainty that these actions by subordinates would cause and did cause inmates including Plaintiffs to contract Valley Fever, and that their failure to properly train and supervise subordinate prison authorities would cause the deprivation of Plaintiffs' rights under the Eighth Amendment.

376. Defendants, as supervisors, did nothing to prevent subordinate prison authorities from causing Plaintiffs' greatly increased risk of contracting Valley Fever.

377. Defendants have engaged in a pattern and practice of conduct since at least 2006 which they knew would place and keep California prison inmates including Plaintiffs incarcerated at locations of unreasonable risk of personal injury.

378. Despite numerous, repeated and explicit warnings about the serious danger of Valley Fever to inmates at the hyper-endemic prisons, and most especially to those identified as high-risk persons with enhanced susceptibility for disseminated cocci disease, Defendants failed to take any of the reasonable, obvious steps needed to protect those involuntarily in their charge.

379. Defendants including Schwarzenegger, Beard, Brazelton, Brown, Cate, Hartley, Hubbard, Hysen, Kelso, Meyer, Rothchild, Winslow, Yates, and one or more Doe Defendants, promulgated, enacted, recommended or contributed to the policies and practices which failed to protect the high-risk inmates including Plaintiffs, as described herein.

380. Defendants knowingly and recklessly promulgated or continued policies and practices described herein that actually and proximately caused Plaintiffs to

contract a disease that is incurable, inflicts life-long suffering, and will likely play a part in the inmates' early death.

381.   These actions, including the knowing transfers to dangerous prisons and the failure to take any action to protect inmates from the dangers within those prisons, particularly Pleasant Valley State Prison, were taken by the Defendants pursuant to the policies and practices which Defendants personally participated in adopting, promulgating, executing or continuing.

382.   Defendants acted with a conscious disregard for human life in deciding to transfer prisoners to hyper-endemic prisons, to keep them at those prisons, and to deliberately neglect to make those prisons safe, defying the many recommendations, input, advice, reports, expert suggestions, in-house studies, generally-available academic and scientific material, as well as other credible and authoritative sources that warned them of the dire risks and consequences that Defendants' actions imposed on Plaintiffs.  Defendants violated Plaintiffs' constitutional rights to be free from cruel and unusual punishment.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF THE EIGHTH AMENDMENT
## (42 U.S.C. § 1983)
## (Deliberate Indifference to Serious Medical Needs)
## (Alleged Against All Defendants)

383. Plaintiffs incorporate the allegations of paragraphs 1-382 as if those allegations were fully set forth herein.

384. All Plaintiffs, including especially ones with pre-existing medical conditions such Barnett, Dallas, Roberts, and Smith, faced an unacceptably high risk of serious medical consequences from their forced exposure to increased risk of Valley Fever at the hyper-endemic prisons.  Plaintiffs, especially ones with pre-existing medical conditions, were guaranteed that, should they contract Valley Fever,

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

they would almost certainly experience adverse medical consequences, and for those with pre-existing conditions, drastic exacerbation of their medical situation.

385. Defendants inflicted unnecessary pain upon Plaintiffs by their indifference to Plaintiffs' medical condition, for healthy inmates as well but particularly if the inmate had a pre-existing medical condition. Exposure to this infection and its medical consequences was without penological justification.

386. Defendants had multiple means to have avoided this harm, such as by complete exclusion from these dangerous prisons, or at a minimum, by screening susceptible inmates including Plaintiffs, preventing these Plaintiffs' transfers to hyper-endemic prisons, reducing the risk at the prisons by remedial measures such as ground cover, ventilation management, protective devices, administrative procedures, and management of inmate exposure to the environmental risks – none of which Defendants ever seriously attempted.

387. Defendants were deliberately indifferent to the risk of Valley Fever and the medical needs of these Plaintiffs, and disregarded the risk and failed to take reasonable actions to protect Plaintiffs from the worsening of their medical conditions.

388. Defendants including Schwarzenegger, Beard, Brazelton, Brown, Cate, Hartley, Hubbard, Hysen, Igbinosa, Kelso, Meyer, Rothchild, Winslow, Yates, and one or more Doe Defendants were aware that Plaintiffs including those identified herein would be at risk of experiencing adverse medical harm from exposure to Valley Fever.

389. These Defendants nevertheless took no action to divert inmates including Plaintiffs away from hyper-endemic prisons including PVSP or to make the facility safe or to protect them while they were housed there.

390. Each of these Defendants displayed a deliberate indifference to the serious health needs of inmates including Plaintiffs, some of whom already had medical conditions that multiplied the unacceptable risk level and consequences of

contracting Valley Fever at the hyper-endemic prisons. Each was personally aware that inmates with identified medical conditions were particularly susceptible to Valley Fever in its most dangerous form, and each of them was in a position to establish or contribute to policies or to take other actions that would have addressed Plaintiffs' serious medical needs.

391. These Defendants failed to fulfill their constitutional responsibility to adequately care for Plaintiffs serious existing medical needs.

**IX**.

**THIRD CLAIM FOR RELIEF**

**STATE LAW NEGLIGENCE**

**(Alleged Against All Defendants)**

392. Plaintiffs incorporate the allegations of paragraphs 1-391 as if these allegations were fully set forth herein.

393. All times pertinent to this action, the Defendants identified herein had both a regulatory and a common law duty to exercise reasonable care to keep the prison environments reasonably safe, and to address known dangerous conditions at those prisons that created unreasonable risk of harm.

394. Defendants also had a special relationship with Plaintiffs, as their jailors, that required Defendants to protect Plaintiffs from known and foreseeable harms.

395. Defendants were aware or should have been aware that, without adequate protective measures addressing the known highly-elevated presence of *Coccidioides immitis* spores at the hyper-endemic prisons, Plaintiffs would be subject to greatly increased exposure to the fungal spores and would therefore be at greatly increased risk of contracting Valley Fever.

396. Defendants negligently failed to take even the rudimentary steps described herein, that were identified and recommended by their own experts, to make those prisons safer for Plaintiffs.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

397. These negligent failures included ministerial decisions, acts and omissions by those Defendants with Facilities responsibilities, both within CDCR management and at the prisons, as well as the negligent failure by Defendants identified herein as having supervisory capacity and responsibilities to adequately supervise subordinates in such decisions, acts and omissions.

398. Defendants' negligence in failing to make the hyper-endemic prisons safe, in the face of known dangerous conditions, was a substantial factor and proximate cause of Plaintiffs' contraction of Valley Fever that has resulted in substantial damage to Plaintiffs.

399. Defendants are liable for the damages their negligence actually and proximately caused.

## X.

## DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

400. Defendants were subjectively aware of the serious risk of harm from Coccidioidomycosis, but deliberately elected to expose Plaintiffs to that risk even though the risk could easily have been avoided.

401. Defendants deliberately violated the Eighth Amendment's prohibition against cruel and unusual punishment and are accordingly denied the protection of qualified immunity.

402. Exposure to serious risks from adverse environmental agents at a prison is an established violation of the Eighth Amendment.

403. Defendants knew that they were exposing Plaintiffs to a potentially life-threatening, permanent ailment and that ready alternatives and protective measures were available. Defendants ignored these risks and took none of the required actions. Defendants are not entitled to qualified immunity or any other immunity for their actions.

# PRAYER FOR RELIEF

*Wherefore*, Plaintiffs request on the First and Second Claims for Relief the following:

(i)     economic damages in an amount to be proven at trial to compensate plaintiffs for the ongoing cost of antifungal medical care (estimated at $5,000/year) and medical monitoring of the disease (estimated at $1,000/year), for the expected cost of periodic hospitalizations due to its flare-ups (estimated by the State to cost about $25,000 per hospitalization)[64] to cover the cost of severe illness brought upon by dissemination of the disease (which ranges from the tens of thousands to hundreds of thousands dollars in medical care, depending on the severity of the disseminated injuries), and the resulting loss in the inmate's ability to work and earn money upon his release, which varies depending on the degree of debilitation of a given inmate;

(ii)     non-economic damages in an amount to be proven at trial for the pain, suffering and misery associated with the experience of the disease and its associated management, the loss of health and enjoyment of life attributable to management of a serious disease, the fear, depression and demoralization associated with the consequences of having a life-long disease, and the risk, and reality, of its disseminated form resulting in severe health consequences up to and including an early and painful death;

(iii)     punitive damages;

(iv)     reasonable attorney's fees pursuant to 42 U.S.C. §§ 1988 and 1997(e) at the maximum allowable rate by statute .

(v)     costs of suit including the expense of experts;

(vi)     interest; and

(vii)     such other relief as the Court deems just and proper.

---

[64] CDCR Report, "*Coccidioidomycosis in California Department of Corrections and Rehabilitation Institutions* (October 10, 2012), p. 5.

Plaintiffs further request on the Third Claim for Relief, the following:

(viii)   economic damages in an amount to be proven at trial to compensate plaintiffs for the ongoing cost of antifungal medical care (estimated at $5,000/year) and medical monitoring of the disease (estimated at $1,000/year), for the expected cost of periodic hospitalizations due to its flare-ups (estimated by the State to cost about $25,000 per hospitalization) to cover the cost of severe illness brought upon by dissemination of the disease, and the resulting loss in the inmate's ability to work and earn money upon his release, which varies depending on the degree of debilitation of a given inmate;

(ix)   non-economic damages in an amount to be proven at trial for the pain, suffering and misery associated with the disease and its management, including the consequences of the mandatory life-long regimen of medications that are themselves dangerous to health; the loss of health and enjoyment attributable to the presence and management of this serious disease; the fear, depression and demoralization associated with avoidably having been infected with a disease that can lead to disfigurement, excruciating pain, and progressive medical deterioration up to and including an early death;

(x)   costs of suit including the expense of experts;

(xi)   interest; and

(xii)   such other relief as the Court deems just and proper.

Respectfully Submitted:

Date: February 5, 2014                      AFFELD GRIVAKES ZUCKER LLP

/s/ Gregg Zucker
Gregg Zucker, Esq.
Attorneys for Plaintiffs

Date: February 5, 2014                      LAW OFFICES OF DAVID ELLIOT

/s/ David Elliot
David Elliot, Esq.
Attorneys for Plaintiffs

Date: February 5, 2014                      BURNS, SCHALDENBRAND, AND RODRIGUEZ

/s/  Edward Burns
Edward Burns, Esq.
Attorneys for Plaintiffs

Date: February 5, 2014                      LAW OFFICES OF
MATTHEW B. PAVONE

/s/ Matthew B. Pavone
Matthew B. Pavone, Esq.
Attorneys for Plaintiffs

Date: February 5, 2014                      LAW OFFICES OF
BENJAMIN PAVONE, PC

/s/ Benjamin Pavone
Benjamin Pavone, Esq.
Attorneys for Plaintiffs

ADDITIONAL ATTORNEYS FOR THE PLAINTIFFS:


THE LAW OFFICES OF
MATTHEW B. PAVONE

══════════════════

**MATTHEW B. PAVONE, ESQ.**

══════════════════

STATE BAR NUMBER 95964
COURTYARD SQUARE
750 GRANT AVENUE, SUITE 250
NOVATO, CALIFORNIA  94945-7003
TELEPHONE: 415 209 9610
FACSIMILE:   415 892 0337
EMAIL: mpavone@pavonelaw.com

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand trial by jury.

Date: February 5, 2014                    AFFELD, GRIVAKES & ZUCKER, LLP

                                          /s/ Gregg Zucker
                                          Gregg Zucker, Esq.
                                          Attorneys for Plaintiffs

Date: February 5, 2014                    LAW OFFICES OF DAVID ELLIOT

                                          /s/ David Elliot
                                          David Elliot, Esq.
                                          Attorneys for Plaintiffs

Date: February 5, 2014                    BURNS, SCHALDENBRAND, AND RODRIGUEZ

                                          /s/  Edward Burns
                                          Edward Burns, Esq.
                                          Attorneys for Plaintiffs

Date: February 5, 2014                    LAW OFFICES OF
                                          MATTHEW B. PAVONE

                                           /s/ Matthew B. Pavone
                                          Matthew B. Pavone, Esq.
                                          Attorneys for Plaintiffs

Date: February 5, 2014                    LAW OFFICES OF
                                          BENJAMIN PAVONE, PC

                                           /s/ Benjamin Pavone
                                          Benjamin Pavone, Esq.
                                          Attorneys for Plaintiffs